PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 08-3621, 08-3790, 08-3791 & 08-3857

———————

IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA
AND GUARANTY NATIONAL BANK OF
TALLAHASSEE SECOND MORTGAGE LOAN
LITIGATION (MDL 1674)

Objecting Class Members,
          Appellants (08-3621)
          (Pursuant to Fed. R. App. P. 12(a))

Alabama and Georgia Objecting Class
Members,
          Appellants (08-3790)
          (Pursuant to Fed. R. App. P. 12(a))

Richard H. Heady, Jr., Robert Rowley, Arline
Rowley, Galen Hurt, Darrell Turner, Michael
Rich, Edna Rich, Patrick Franklin, Michael
Graham, Tracy Graham, Eric Lewis, Barbara
Lewis, David Davidson, Michael Moore, Karla
Moore, Anthony Dixon and Kathy Dixon.
          Appellants (08-3791)
          (Pursuant to Fed. R. App. P. 12(a))

Troy Elliott, Lorrain Oswald and Ruth D. Mathis-Wisseh,

Appellants (08-3857)
(Pursuant to Fed. R. App. P. 12(a))

———————————

No. 09-2001

———————————

JOHN DRENNEN; ROWENA DRENNEN; DAVID GARNER; DIANE GARNER; SHAWN STARKEY; LORENE STARKEY,

Appellants

v.

PNC BANK NATIONAL ASSOCIATION; GMAC-RESIDENTIAL FUNDING CORPORATION, a Minnesota Corporation; HOMECOMINGS FINANCIAL NETWORK INC., a Delaware Corporation

———————————

Appeal from the United States District Court for the Western District of Pennsylvania (D.C. Civil Action Nos. 2-02-cv-01201, 2-03-cv-00425, 2-05-cv-00688 and 2-05-cv-01386) District Judge: Honorable Gary L. Lancaster

2

———————————

Argued April 20, 2010

Before: SCIRICA[*], <u>Chief Judge</u>, AMBRO, <u>Circuit Judge</u> and
JONES[**], <u>District Judge</u>

(Opinion filed:  September 22, 2010)

Garrett M. Hodes, Esquire
David M. Skeens, Esquire
J. Michael Vaughan, Esquire
Roy Frederick Walters, Esquire (Argued)
Walters, Bender, Strohbehn & Vaughan
1100 Main Street
2500 City Center Square
P.O. Box 26188
Kansas City, MO   64196

Michael J. Cartee, Esquire
John J. Lloyd, Esquire
Cartee & Lloyd
2210 Eighth Street, Suite B

———————————

[*]Judge Scirica completed his term as Chief Judge on May
4, 2010.

[**]The Honorable John E. Jones, III, United States District
Judge for the Middle District of Pennsylvania, sitting by
designation.

3

Tuscaloosa, AL   35401

C. Knox McLaney, III, Esquire
McLaney & Associates
509 South Court Street
Montgomery, AL   36104

Franklin R. Nix, Esquire
Law Offices of Franklin R. Nix
1020 Foxcroft Road, N.W.
Atlanta, GA   33032-2624

John W. Sharbrough, III, Esquire
The Sharbrough Law Firm
156 St. Anthony Street
Mobile, AL   36603

Scott C. Borison, Esquire
Legg Law Firm
5500 Buckeystown Pike
Frederick, MD   21703

J. Jerome Hartzell, Esquire (Argued)
Hartzell & Whiteman
2626 Glenwood Avenue, Suite 500
Raleigh, NC   27608

Mallam J. Maynard, Esquire
Financial protection Law Center, Suite 342
P.O. Box 390
Wilmington, NC   28402

Robert B. Smith, Esquire
Smith, Cohen & Mork
445 Fort Pitt Boulevard
210 Fort Pitt Commons
Pittsburgh, PA   15219

Counsel for Appellants

Eric G. Calhoun, Esquire
Travis & Calhoun
1000 Providence Towers East
5001 Spring Valley Road
Dallas, TX   75244

R. Bruce Carlson, Esquire (Argued)
Gary F. Lynch, Esquire
Carlson Lynch
36 North Jefferson Street
P.O. Box 7635
New Castle, PA   16107

Daniel O. Myers, Esquire
A. Hoyt Rowell, III, Esquire
Richardson, Patrick, Westbrook & Brickman
1037 Chuck Dawley Boulevard, Building A
Mount Pleasant, SC   29464

Kevin Oufnac, Esquire
Richardson, Patrick, Westbrook & Brickman
174 East Bay Street
Charleston, SC   29401

Thomas L. Allen, Esquire (Argued)
Roy W. Arnold, Esquire
David J. Bird, Esquire
Donna M. Doblick, Esquire
Nina M. Faber, Esquire
Reed Smith
225 Fifth Avenue
Pittsburgh, PA   15222

Darryl J. May, Esquire (Argued)
Ballard Spahr
1735 Market Street, 51st Floor
Philadelphia, PA   19103

David G. Oberdick, Esquire
Meyer, Unkovic & Scott
535 Smithfield Street
1300 Oliver Building
Pittsburgh, PA  15222

F. Douglas Ross, Esquire
Odin, Feldman & Pittleman
9302 Lee Highway, Suite 1100
Fairfax, VA   22031

J. Scott Watson, Esquire
Federal Deposit Insurance Corporation
Appellate Litigation Section VS-7008
3501 North Fairfax Drive
Arlington, VA   22226

Counsel for Appellees

───────────

OPINION OF THE COURT

───────────

AMBRO, Circuit Judge

Table of Contents

I. **Factual and Procedural Background**. . . . . . . . . . . . . . . 10
    A.  The Alleged Predatory Lending Scheme.. . . . . . . 10
        B.  The Separate Class Actions and the Initial
           Settlement.. . . . . . . . . . . . . . . . . . . . . . . . . 11
        C.  The Objectors.. . . . . . . . . . . . . . . . . . . . . . 17
    D.  The Prior Appeal.. . . . . . . . . . . . . . . . . . . . . 21
    E.  The Proceedings on Remand.. . . . . . . . . . . . . . . 23
        1.  The *Hobson* Action.. . . . . . . . . . . . . . . . . 23
        2.  The Objectors Withdraw Their Motion to
           Intervene.. . . . . . . . . . . . . . . . . . . . . . . . . 24
        3.  The District Court's Viability Briefing.. . . 25
        4.  The Modified Settlement. . . . . . . . . . . . . 27
        5.  The District Court Determines the
           TILA/HOEPA Claims
           Are Not Viable.. . . . . . . . . . . . . . . . . . . 30
        6.  The District Court Appoints a "Friend of
           the Court.. . . . . . . . . . . . . . . . . . . . . . . 32
        7.  The District Court Denies the Objectors'
           Renewed Motion to Intervene,
           Conditionally Re-Certifies the Class,

and Preliminarily Approves the
Modified Settlement. . . . . . . . . . . . . . . 34

8. The District Court Certifies the Class and
Approves the Modified Settlement.. . . 36

II. **Jurisdiction and Standards of Review**. . . . . . . . . . . . . 37

III **Discussion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    A. Class Certification.. . . . . . . . . . . . . . . . . . . . . . . . 39
        1. Legal Standards. . . . . . . . . . . . . . . . . . . . . 39
        2. Statute-of-Limitations Issues at the Class
Certification Stage. . . . . . . . . . . . . . . 42
        3. The District Court's Analysis. . . . . . . . . . . 49
            a. The District Court's Relation-Back
Analysis. . . . . . . . . . . . . . . . . . . 50
            b. The District Court's Equitable
Tolling Analysis.. . . . . . . . . . . 64
        4. Adequacy of Representation. . . . . . . . . . . 70
            a. The Class Representatives. . . . . . . 70
            b. Class Counsel. . . . . . . . . . . . . . . 73
        5. The North Carolina Objectors. . . . . . . . . 83
    B. The Fairness of the Settlement. . . . . . . . . . . . . . 89
    C. The Objectors' Renewed Motion to Intervene. . . 93
    D. The Objectors' Renewed Petition for Mandamus
to Recuse the District Judge. . . . . . . . . . . . . . 95

IV. **Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

      This is the second appeal from the certification of a consolidated "settlement only" nationwide class action that

alleged an illegal home equity lending scheme involving two banks and a company that purchased second mortgage loans from them. Certain members of the class (the "Objectors") contest the District Court's decisions certifying that class and approving the class settlement. As it was in the prior appeal, the principal dispute remains the named plaintiffs' and class counsel's decision not to make claims against the defendants under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and the Home Ownership and Equity Protection Act ("HOEPA"), *id.* § 1639. The Objectors contend that the failure to do so renders the named plaintiffs and class counsel inadequate class representatives.

We conclude that the District Court—by approaching the adequacy-of-representation questions on remand as though it were ruling on a motion to amend pursuant to Federal Rule of Civil Procedure 15(c) or a motion to dismiss pursuant to Rule 12(b)(6)—applied the wrong legal standard in ruling on class certification under Rule 23. We thus reluctantly vacate again the Court's certification decision and its approval of the class settlement, and remand for further proceedings. In doing so, we continue to reject (i) the claim that the District Court abused its discretion in denying the Objectors' renewed motion to intervene, and (ii) their renewed petition for mandamus to recuse the District Judge in this case.

9

## I.    Factual and Procedural Background

### A.    The Alleged Predatory Lending Scheme

The complex factual and procedural history of these matters is set out at length in our prior opinion, and we only summarize it here. *See In re Community Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005)("*Community Bank I*"). These class actions involve the alleged predatory lending scheme of the Shumway/Bapst Organization ("Shumway"), a residential mortgage loan business involved in facilitating the making of high-interest, mortgage-backed loans to debt-laden homeowners. Because Shumway is not a depository lender—and thus subject to fee caps and interest ceilings under various state laws—it allegedly formed relationships with defendants Community Bank of Northern Virginia ("CBNV") and Guarantee National Bank of Tallahassee ("GNBT"), both financially distressed banks,[1] to circumvent those restrictions. This allegedly permitted Shumway to conceal the origin of the loans, thus creating the appearance that fees were paid solely to a depository institution when "[i]n reality . . . the overwhelming majority of fees and other charges associated with the loans were funneled to Shumway." *Id.* at 284.

The class action complaint claimed defendant GMAC

-----

[1] CBNV was acquired by Mercantile Bankshares Corp. in 2005. Mercantile is now owned by PNC Bank, N.A.

Residential Funding Corporation ("RFC") was a co-conspirator in this scheme, deriving a substantial portion of its business by purchasing "jumbo" and high "loan-to-value" loans from CBNV and GNBT in the secondary market. The named plaintiffs asserted that RFC acted with knowledge that CBNV and GNBT were mere "straw parties" used to funnel origination and title services fees to Shumway. Because these fees were incorporated into the principal on the loan, RFC purportedly benefitted from the practice through increased interest income.

In 2001, the federal Comptroller of the Currency investigated and audited GNBT, and imposed tighter restrictions on the bank. Shortly thereafter, RFC announced that it would no longer purchase high interest mortgage loans like those originated by CBNV and GNBT. RFC's withdrawal, in turn, caused the Shumway organization to shut down in early 2003.[2]

B.    The Separate Class Actions and the Initial Settlement

The consolidated class actions before us began as six separate class actions. The first—*Davis v. CBNV*, which named

---

[2] In March 2004, the Comptroller of the Currency declared GNBT to be "unsafe and unsound," and appointed as receiver the Federal Deposit Insurance Corporation. *Id.* at 293. The FDIC was then substituted for GNBT as the real party in interest in the class action.

11

CBNV and RFC as defendants—was filed in Pennsylvania state court in May 2001 as a putative state-wide class action and was later removed to federal court (on federal preemption grounds). The first action to name GNBT and RFC as defendants was *Ulrich v. GNBT*, filed in the District Court for the Western District of Pennsylvania in September 2002 as a putative nationwide class action. The remaining four actions are: *Sabo v. CBNV*, filed in federal court in September 2002 as a putative nationwide class action; and *Picard v. CBNV* (October 2002), *Mathis v. GBNT* (November 2002), and *Kessler v. RFC* (February 2003), all filed in Pennsylvania state court as putative state-wide class actions and later removed to federal court in the Western District. R. Bruce Carlson of Carlson Lynch Ltd., located in Sewickley, Pennsylvania, was the lead plaintiffs' attorney in all six actions, and was subsequently appointed as class counsel by the District Court.[3]

These actions asserted claims against CBNV, GNBT, and RFC under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; and the usury, unfair trade practices, and consumer protection laws of Pennsylvania. Section 8(a) of RESPA prohibits the giving or accepting of any "fee, kickback, or thing

---

[3] In addition to Carlson Lynch Ltd., the class is also represented by the Charleston, South Carolina law firm of Richardson, Patrick, Westbrook & Brickman, LLC.

of value" in exchange for referrals of federally related mortgage loans. 12 U.S.C. § 2607(a). Section 8(b) prohibits the giving or accepting of "any portion, split, or percentage" of unearned fees. *Id.* § 2607(b). Plaintiffs alleged that defendants violated RESPA in both ways: (1) by charging excessive origination fees (often as high as 10% of the loan principal) and paying them as "kickbacks" to Shumway in exchange for its mortgage-solicitation services; and (2) by charging title services fees for services that were never performed. Plaintiffs alleged that RFC, as the assignee of the closed loans, was derivatively liable for the banks' conduct. *See* 15 U.S.C. § 1641(d)(1).

In July 2003, the named plaintiffs and the defendants (collectively, the "Settling Parties") moved for preliminary approval of a proposed nationwide class action settlement (the "Initial Settlement"). The settlement class was defined to include all persons (1) who entered into a loan agreement with CBNV or GNBT, (2) whose loan was secured by a second mortgage or deed of trust on property located in the United States, and (3) whose loan was purchased by RFC. There was no time restriction on the class, which encompassed approximately 44,000 loans (dating back to as early as 1998).

In reaching the Initial Settlement, the Settling Parties agreed that the "realistic best-case scenario for RESPA damages on a per-loan basis" was $4,765 ($3,675 for origination fees and $1,090 for title service fees). With a class of approximately 44,000 members, the Settling Parties concluded that the total

13

"best-case" recovery for the class (after averaging the amount of individual fees charged) was approximately $200 million.[4]

The Initial Settlement committed defendants to pay up to $33 million, with class members receiving between $250 and $925 each. The settlement fund would be allocated among class members based on two core factors: (1) when the class member's loan closed; and (2) the class member's state of residence when the loan closed.

First, $23.2 million would be distributed automatically based on the date the loans closed. The approximately 14,000 class members whose loans closed within one year of the "relevant complaints"—*i.e.*, the earliest class action complaint filed against the bank that made the loan to the class member,

---

[4] RESPA provides that "[a]ny person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." 12 U.S.C. § 2607(d)(2). Thus, if the settlement fees charged by defendants violated RESPA, an individual plaintiff would (assuming he or she prevailed at trial or on summary judgment) be entitled to three times the amount of those fees. The Settling Parties did not factor in the potential trebling of damages under RESPA, which would push up the "best-case" recovery per class member to more than $14,000 (and more than $600 million for the class as a whole).

14

the *Davis* Complaint (for CBNV borrowers) and the *Ulrich* Complaint (for GBNT borrowers)—would receive $600 automatically. This structure reflected the hurdle posed by RESPA's one-year statute of limitations, which begins to run "from the date of the occurrence of the violation," 12 U.S.C. § 2614, *i.e.*, the date the loan closed, *see, e.g.*, *Snow v. First Am. Title Ins. Co.*, 332 F.3d 356, 359–61 (5th Cir. 2003). As the Settling Parties explain, "[t]his was a negotiated compromise of a vigorously disputed issue": whether the named plaintiffs in the other four actions, as well as the absent class members, could rely on the filing dates of the *Davis* and *Ulrich* complaints to make their RESPA claims timely. (Settling Parties' Br. at 71.)

Class members whose loans closed more than one year before the *Davis* or *Ulrich* complaints were filed would automatically receive $250 (less than half of the automatic payment to class members with timely claims). However, these class members were eligible to receive an additional $302 (for a total of $552) based on their answers to questions in a claims submission form designed to determine whether they could rely on equitable tolling as a defense to the expiration of the one-year limitations period.

Finally, class members could receive an additional $325 if they resided in one of 21 "Qualifying States" where class counsel determined that class members could have pursued state

15

law claims against CBNV, GNBT, and/or RFC.[5]

The Initial Settlement provided for "an extremely generous fee" of $8.1 million to class counsel, *Community Bank I*, 418 F.3d at 315, and incentive fee payments to the named plaintiffs of $1,500 each. It also included a broad release of all claims that were (or could have been) asserted in the litigation. The release specifically included claims that could have been brought under TILA and HOEPA, including claims for actual damages, statutory damages, and rescission.

Less than a week after the Settling Parties' filed their motion, the District Court entered an order (1) consolidating these six actions into the *Kessler* action[6] (2) "conditionally" certifying a class for settlement purposes; and (3) preliminarily approving the Initial Settlement. The Court also directed that notice be sent to members of the class advising them of the settlement and of their right to opt out. Later that year (in November 2003), the Court approved the filing of an amended

_____

[5] The "Qualifying States" are: Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Missouri, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Washington, Wisconsin, Wyoming, and Virginia.

[6] For ease of reference, we collectively refer to the six consolidated class actions before us in this appeal as the "consolidated *Kessler* action."

16

consolidated class action complaint action for all six actions (the "Consolidated Amended Complaint") to cure what the Court viewed as a potential jurisdictional problem regarding the *Kessler* action (as noted, the action into which the six class actions had been consolidated).[7]

C.      The Objectors

As noted, none of the named plaintiffs brought claims against the defendants under TILA or HOEPA. This prompted several plaintiffs' firms—whom we shall refer to collectively as "counsel for the Objectors"—to mail letters to members of the putative class urging them to communicate with those law firms regarding the settlement, and, in some instances, urging them to opt out of the class. 418 F.3d at 287–88. A principal reason given was the allegedly inadequate consideration paid by the defendants for release of the class members' TILA and HOEPA claims.

---

[7] In *Community Bank I*, we rejected the Objectors' argument that the District Court lacked subject matter jurisdiction over the *Kessler* action. Though no federal question appeared on the face of the initial *Kessler* complaint, we held that the filing of the Consolidated Amended Complaint—which explicitly asserted federal causes of action in all six actions (including claims under RESPA and RICO)—cured the jurisdictional defect. 418 F.3d at 293–98.

17

TILA is a federal consumer protection statute, intended to promote the informed use of credit by requiring certain uniform disclosures from lenders. The statute is implemented by Regulation Z, 12 C.F.R. §§ 226.1 *et seq.*, which requires creditors who make loans secured by a borrower's principal dwelling to provide those borrowers with certain material disclosures, *id.* § 226.18. HOEPA, enacted as an amendment to TILA, applies to a special class of regulated loans that are made at higher interest rates and are subject to special disclosure requirements. *See* 15 U.S.C. § 1639. In particular, HOEPA requires lenders to disclose to their borrowers the annual percentage rate ("APR") of sums due for the use of monies loaned and the amount of regular monthly payments. *Id.* § 1639(a)(2). According to the Objectors, the vast majority of class members' loans are subject to HOEPA. Like claims for damages under RESPA, TILA/HOEPA damages claims are subject to a one-year statute of limitations. *Id.* § 1640(e).

The Objectors allege that defendants violated TILA and HOEPA by understating materially the APR in the disclosure forms they were required to give borrowers when the loans closed. The calculation of the APR must incorporate "finance charges," as defined in Regulation Z, 12 C.F.R. § 226.4. See also 15 U.S.C. § 1605(a). Although fees for title abstracts and title examinations ordinarily are excluded from the definition of "finance charges," *id.* § 226.4(c)(7)(i), and therefore not incorporated into the calculation of the APR, the Objectors contended that the fees charged by CNBV and GNBT were

18

neither "bona fide" nor "reasonable"—and thus should have been factored into the calculation of the APR, *id.* § 226.4(c)(7)—because (1) no title examinations were performed, and (2) no true abstracts of title were obtained. Instead, the Objectors alleged that borrowers were charged for "property reports" (which allegedly are neither "true" title examinations nor abstracts) by entities affiliated with Shumway, and that this charge was illegally marked up and passed on to the borrower.[8]

The Objectors contend that each class member's claims under TILA/HOEPA are worth as much as $52,000 per loan, which figure includes actual, statutory, and rescission damages.[9]

---

[8] Though not the focus of their arguments on appeal, we note that the Objectors alleged that defendants violated TILA/HOEPA in two other ways: (1) failing to give borrowers a one-page HOEPA disclosure document three days prior to the loan closing; and (2) including a prepayment penalty provision on loan documents that did not identify one of the five circumstances in which the lender could enforce that provision.

[9] "[A]ny creditor who fails to comply with any requirement imposed under" TILA is liable to the borrower "in an amount equal to the sum of . . . any actual damage sustained by [the borrower] as a result of the failure." 15 U.S.C. § 1640(a)(1). In addition to actual damages, a violation of TILA with respect to a loan governed by HOEPA entitles the borrower to an award of statutory damages in "an amount equal to the sum

Together with the defendant's potential liability under RESPA (including trebled damages), the Objectors contend that the actual value of the claims being released is almost $3 billion (approximately $67,000 per class member).

By October 2003, 435 class members had opted out of the class settlement. Two weeks later, the District Court—"without conducting a hearing, setting a briefing schedule or otherwise allowing [the Objectors] any practical opportunity to be heard"—granted the Settling Parties' joint motion to invalidate those opt-outs. *Community Bank I*, 418 F.3d at 288. The Court entered an order that "followed verbatim the Order proposed by the [S]ettling [P]arties" extending the opt-out period to November 2003. *Id.* Finally, the Court

---

of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material." *Id.* § 1640(a)(4). Finally, when a borrower exercises the right of rescission (as a result of a violation of TILA), he or she is entitled to a return of all finance and other charges made in connection with the loan. *See id.* § 1635.

In a class action asserting a violation of TILA, the total class recovery may not exceed $500,000 or one percent of the creditor's net worth (whichever is less). *Id.* § 1640(a)(2)(B). The Parties do not dispute, however, that this cap does not apply to the special HOEPA statutory damages provision. *See* Elizabeth Renuart & Kathleen Keest, *Truth in Lending* § 8.8.3.1, at 626 (Nat'l Consumer Law Ctr., 6th ed. 2007 & Supp. 2009) (citing 15 U.S.C. § 1640(a)(4)).

entered an order barring the objecting law firms from communicating with any member of the class, and denied the Objectors' motion to intervene "without explanation." *Id.* at 289, 291.

D.    The Prior Appeal

The District Court held a hearing on the fairness of the Initial Settlement on November 14, 2003, and heard argument from the Settling Parties and the Objectors. On December 4, 2003, the Court entered a final order approving the settlement. The Objectors timely appealed.

In *Community Bank I*, we vacated the District Court's certification of the class and approval of the settlement, concluding that the Court had erred in several ways, including by: (1) failing to make an independent inquiry as to whether the Rule 23 class action requirements were satisfied; (2) improperly enjoining counsel for the Objectors from communicating with absent class members; and (3) denying the Objectors' motion to intervene without "reasoning or discussion." *Id.* at 314. As a result, we declined "to address definitively the substantive nature of the settlement." *Id.* at 318.

With respect to the District Court's certification decision, we concluded that three of the four Rule 23(a) requirements—numerosity, typicality, and commonality—were met, as well as the Rule 23(b)(3) predominance and superiority

requirements. *Id.* at 303–10. We expressed serious concerns, however, as to whether the adequacy requirement of Rule 23(a) could be met, specifically in the context of whether the named plaintiffs and class counsel were adequate representatives in light of their failure to assert colorable TILA/HOEPA claims.

We were particularly concerned in *Community Bank I* with the Settling Parties' invoking the statute-of-limitations defense to justify declining to bring TILA/HOEPA claims. We noted that the Settling Parties themselves had represented to our Court and the District Court that "approximately 14,000 members of the class have loans that . . . closed 'within one year of the date of filing of the relevant complaint.'" *Id.* at 305. Accordingly, it "appear[ed] that one-third of the class may have affirmative TILA and HOEPA claims that are not time barred." *Id.* We doubted whether the named plaintiffs' interests were "sufficiently aligned with those of the absent class members" if the District Court determined that the TILA/HOEPA claims were "viable," noting that, "[b]ecause the one-year statutory period for filing an affirmative TILA or HOEPA claim has lapsed for all named plaintiffs, [they] appear to have no incentive to maximize such claims for the approximately 14,000 class members who may still retain this valuable cause of action." *Id.* at 306–07.

In that light, "[a]t the very least . . . consideration should have been given to the feasibility of dividing the class into sub-classes so that a court examining the proposed settlement could

22

have judged the fairness of the settlement as it applied to similarly situated class members." *Id.* at 307. We thus directed that, should the District Court find on remand that class certification is appropriate, it also "should determine whether subclasses are necessary or appropriate." *Id.* at 310.

We also expressed concern over whether "the absent class members' interests were sufficiently pursued by class counsel":

> We have already noted that class counsel never asserted colorable TILA and HOEPA claims. However, those claims were part of the settlement release. Failure to pursue such claims may suggest that class counsel [abdicated] their duty to the class in favor of the enormous class-action fee offered by defendants.

*Id.* at 307–08. Though we emphasized that we were not "preclud[ing] the possibility that the adequacy of class representation c[ould] be established on a more developed record," we "instructed [the Court] to examine carefully this matter on remand." *Id.* at 308.

E.      The Proceedings on Remand

1.      The *Hobson* Action

23

To begin, we note another putative nationwide class action relevant to (though not a part of) these appeals. While the appeal in *Community Bank I* was pending, counsel for the Objectors filed a putative nationwide class action—captioned *Hobson v. Irwin Union Bank and Trust Co., et al.*—in the federal District Court for the Northern District of Alabama. According to the Objectors, *Hobson* "was filed to address the inadequacy of the Settling Plaintiffs and their failure to pursue, but nonetheless release, TILA/HOEPA claims," as well as to represent persons who (1) were victims of the Shumway predatory lending scheme, but (2) whose loans were not purchased by RFC (and thus did not fall within the class). (Objectors' Br., No. 08-3621, at 22.)

In May 2005, the Judicial Panel for Multidistrict Litigation transferred *Hobson* to the Western District of Pennsylvania. After our remand in *Community Bank I*, the attorneys for the *Hobson* plaintiffs filed (1) a motion for class certification (in *Hobson*), (2) a motion to appoint one of the law firms representing the Objectors—Walters, Bender, Strohbehn & Vaughn—as interim lead class counsel (in the *Hobson* action, as well as the consolidated *Kessler* action), and (3) a motion to file a Proposed Second Amended Class Action Complaint (in the consolidated *Kessler* action).

2.      The Objectors Withdraw Their Motion to Intervene

24

In November 2005, the District Court held a conference call with counsel for the Settling Parties and the Objectors to discuss how to proceed on remand. Class counsel advised the Court that it intended to continue to pursue approval of the Initial Settlement. The Court then asked Michael Vaughn, Esq. (of the Walters, Bender firm) whether he still wished to pursue intervention. Mr. Vaughn responded no, explaining that he believed the transfer of *Hobson* to the MDL proceeding was an adequate way to seek the assertion of the potential TILA/HOEPA claims, and that the intervention issue had essentially been "moot[ed] by the MDL transfer" of *Hobson*.

### 3. The District Court's Viability Briefing

During the same conference call, the District Court also appointed a Steering Committee—composed of various lawyers from the law firms representing the class, the defendants, and the Objectors—to establish a briefing schedule to address the merits of the potential TILA/HOEPA claims. The Court explained that it envisioned a bifurcated analysis on remand: (1) it would first address the viability of potential TILA/HOEPA claims; and (2) then address adequacy and the other Rule 23 elements. Mr. Vaughn agreed with this structure:

> The Court: I think the first thing we have to do is determine the viability of these claims. If I determine that they are viable, then I think the argument as to whether or not the named

25

representative you have can adequately represent those members of your class who have such claims . . . is Question No. 2.

Mr. Vaughn: We agree with that, Your Honor.

The Court: If I say they're not viable because of statute of limitations, or the elements can't be met, or something like that, then I think that the wind might be out of your sails here.

Mr. Vaughn: Your Honor, I think you're right.

The Steering Committee negotiated a briefing schedule allowing all interested parties to submit briefs on the viability issue. The scheduling order also provided for an exchange of certain loan files, and stipulated that no other formal discovery would occur.

Counsel for the Objectors and the defendants submitted extensive briefing dealing with the TILA/HOEPA issues. Class counsel, however, did not brief the issue. Instead, they submitted a filing to the District Court stating that they (i) "expect[ed] that counsel for the Defendants group will file with the Court an initial 'viability' brief that thoroughly discusses the legal backdrop of the class-based TILA/HOEPA claims that are in dispute," and (ii) concluded, "after much reflection, that [the] Court would not benefit from a brief by [the named plaintiffs]

26

that would discuss much of the same authority set forth in the initial brief filed by the Defendants." Counsel "elected to wait and see which arguments . . . are advanced in the initial submission" by the Objectors, and thereafter file a brief

> with a comprehensive recitation of relevant facts that demonstrates: 1) what [counsel] learned through their investigation into the underlying conduct in dispute; 2) how that factual information bears upon the class-based TILA/HOEPA theories at issue; and[] 3) the strategy underlying the specific legal claims that they elected to pursue in this litigation, given the facts that they learned in their investigation.

Though class counsel in fact submitted this brief, the District Court, as we discuss below, did not discuss it in ruling on the viability question.

### 4. The Modified Settlement

As the parties were briefing the viability issue, the Settling Parties entered into new settlement negotiations to "explore a possible enhancement to the [Initial] Settlement." (Settling Parties' Br. at 24.) Counsel for the Objectors initially participated in those negotiations, including unsuccessful mediation before retired District Court Judge Nicholas Politan of the District of New Jersey.

27

During the summer of 2006, the Settling Parties (who were not joined by counsel for the Objectors) negotiated an "enhanced" settlement (the "Modified Settlement") with the assistance of former Third Circuit Judge Timothy Lewis. According to the Settling Parties, "[t]he renewed settlement negotiations considered the alleged monetary damages Class members ostensibly could have sought assuming . . . that the posited TILA/HOEPA claims had been pleaded and could potentially survive a Rule 12(b) motion." (Settling Parties' Br. at 25.) The Settling Parties determined that the potential "actual" (*i.e.*, compensatory) damages the Objectors were claiming under TILA/HOEPA amounted to, on average, approximately $415 per loan. (*Id.*) However, because of "Defendants' perception of the strength of their statute of limitations . . . defenses," they refused to make any additional payments to any member of the Class in exchange for the release of their potential TILA/HOEPA liability without first determining whether a given Class Member had some basis for relying on equitable tolling. Accordingly, the Settling Parties proposed a claim form containing the following questions for class members to answer:

1.  Did you read your Settlement Statement (Form HUD-1) prior to obtaining your loan?

2.  At the time that you obtained your . . . loan, did you believe that the Statement of

28

Settlement Charges listed on your HUD-1 was accurate?

3. At the time that you obtained your . . . loan, did you believe that the Settlement Charges listed on your HUD-1 were for services actually performed?

4. At the time that you obtained your CBNV [or GNBT] loan, did you believe that the Settlement Charges listed on your HUD-1 were reasonable and appropriate?

The Modified Settlement provided that if a class member responds to these questions "appropriately," he or she is entitled to an additional $332, representing approximately 80% of the class member's potential actual damages under TILA and HOEPA. The defendants agreed to pay up to an additional $14.6 million to those persons, for a total of $47.6 million.

In addition, the Modified Settlement reduced the amount of attorneys' fees that class counsel would petition the Court to approve from $8.1 million to $7.5 million. Defendants also agreed to pay "up to an additional $2 [million] in attorneys' fees and costs"—presumably, to counsel for the Objectors—"if so ordered by the Court." The Modified Settlement followed the terms of the Initial Settlement in all other material respects.

29

### 5. The District Court Determines the TILA/HOEPA Claims Are Not Viable

The District Court held oral argument on the viability issues in July 2006.[10] It asked Counsel for the Objectors what "standard" it should use to determine the viability of the TILA/HOEPA claims. Counsel for the Objectors agreed with the District Court that our Court had intended for it to apply a Rule 12(b)(6) standard, as did class counsel. At the same time, Counsel for the Objectors argued that the statute-of-limitations defense could not be determined using such a standard, as it presented factual questions that "[r]arely can . . . be disposed of by . . . a motion to dismiss." By contrast, counsel for the defendants argued that a Rule 12(b)(6) standard was inappropriate, arguing that our Court "did not contemplate that this viability standard . . . could be satisfied just by showing the 12(b)(6) standard was satisfied."

The District Court disagreed with the defendants' counsel, explaining that the question should be whether, "taking [the Objectors'] allegations as true, does a claim exist under TILA or HOEPA?" The Court stated that it believed such a cause of action could be adequately stated under Rule 12(b)(6), but characterized the merits of the statute-of-limitations defense as a "tough one."

---

[10] At the outset of the hearing, class counsel notified the Court of the Modified Settlement.

30

In October 2006, the District Court issued a 33-page "Memorandum" (the "2006 Memorandum") in which it determined that the proposed TILA/HOEPA claims for damages and rescission were not viable. At the outset, the Court explained that it had interpreted our decision in *Community Bank I* as directing it to

> apply a hybrid standard of review. Namely, the court of appeals directed this court to examine whether the Class Plaintiffs were inadequate representatives under Rule 23. The court of appeals questioned whether the Class Plaintiffs were inadequate if they failed to assert TILA/HOEPA claims that were "viable." Thus, it appears that the court of appeals intended this court to examine whether the Class Plaintiffs were inadequate representatives under Rule 23 because they failed to assert TILA/HOEPA claims which could have survived a Rule 12(b)(6) motion to dismiss.

In the end, the Court agreed with the defendants' "principal argument" regarding the viability question: "that the TILA/HOEPA claims for damages are not viable because they are time barred."

We discuss the District Court's viability conclusions at length below. To summarize, it first agreed with the defendants

31

that no class member could bring a timely claim under TILA or HOEPA for damages or rescission, as no such amended pleading could satisfy the requirements of Federal Rule of Procedure 15(c), and thus could not relate back to any earlier complaint in the consolidated *Kessler* action. In addition, the Court determined (while applying a Rule 12(b)(6) standard) that no class member could rely on equitable tolling to save their otherwise time-barred claims.

The Objectors filed a motion asking the District Court to reconsider its 2006 Memorandum, and alternatively asked it to certify the Memorandum for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Court denied both motions.[11]

6.      The District Court Appoints a "Friend of the Court"

The District Court held a conference call with counsel for the Settling Parties and the Objectors on December 1, 2006, and expressed its intent to appoint an "independent body" to evaluate the fairness of the Modified Settlement. The Court made clear that it would not ask this "independent body" to "evaluate the case in terms of whether the requirements of Rule

---

[11] In February 2008, the Objectors filed with our Court a petition for mandamus and permission to appeal under Federal Rule of Civil Procedure 23(f). We denied that petition in March 2008.

23 have been met or not." Counsel for the Objectors raised no objection to the Court's proposal at this time.

The Court later chose retired Chief Judge Donald Ziegler of the District Court for the Western District of Pennsylvania to serve as a "friend of the court," and to provide a "non-binding advisory opinion" as to whether the Modified Settlement was "fair and reasonable" under Rule 23. In March 2007, the Settling Parties and the Objectors presented oral arguments to Judge Ziegler regarding the fairness of the Modified Settlement. However, counsel for some of the Objectors objected to the process, arguing to Judge Ziegler that his appointment was improper.[12]

---

[12] The Objectors renew that challenge before our Court, arguing that the District Court's appointment of Judge Ziegler was improper because he was not appointed as an expert or a special master. *See* Fed. R. Civ. P. 53(c); *see also Manual for Complex Litigation* (Fourth) § 21.632 (2004) ("Whether the case has been certified as a class at an earlier stage or presented for certification and settlement approval at the same time, the judge can have a court-appointed expert or special master review the proposed settlement terms, gather information necessary to understand how those terms affect the absent class members, and assist the judge in determining whether the fairness, reasonableness, and adequacy requirements for approval are met."). Because the Objectors did not challenge the appointment until oral argument before Judge Ziegler—and despite having six weeks between receiving notice of the

Judge Ziegler issued his advisory opinion in July 2007, and concluded that the Modified Settlement was fair, reasonable, and adequate. He reasoned that the named plaintiffs faced significant obstacles to their RESPA and RICO claims if the case proceeded to trial, including the possibility that they would be unable to prove that defendants had charged them fees (*e.g.*, title fees and origination fees) for services that were not actually performed. However, Judge Ziegler did not consider whether the Modified Settlement was fair in the context of the Objectors' arguments that the class members' TILA/HOEPA claims were significantly more valuable, noting that the District Court "ha[d] already concluded that there are no viable TILA/HOEPA claims" and that he was not authorized to "revisit that issue."

> 7. The District Court Denies the Objectors' Renewed Motion to Intervene, Conditionally Re-Certifies the Class, and Preliminarily Approves the Modified Settlement

By the Fall of 2007, the Settling Parties and the Objectors had fully briefed the Settling Parties' motion for conditional re-

---

appointment and the argument—they have waived this challenge, and we decline to address it. *See, e.g.*, *Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of P.R.*, 167 F.3d 1, 6 (1st Cir. 1999).

certification of the class and preliminary approval of the Modified Settlement. After a hearing on those motions, on November 9, 2007, the Walters, Bender firm filed a "renewed" motion to intervene in the consolidated *Kessler* action, arguing that the Modified Settlement was the product of collusion between class counsel and counsel for defendants.

In January 2008, the District Court conditionally re-certified the Class, preliminarily approved the Modified Settlement, re-appointed class counsel, and re-appointed the named plaintiffs as class representatives. The Court also denied the Objecting Class Member's Renewed Motion to Intervene as untimely, stating that

> the Objectors orally withdrew their motion to intervene in November of 2005. Although the court will direct the Settling Parties to submit a revised notice plan and provide the class with an additional period to opt out, under the unique circumstances of this case, the Objectors['] renewed motion is untimely. . . . They have identified no persuasive reason why they failed to pursue intervention in the interim other than their dissatisfaction with the court's rulings to date.

The Settling Parties then filed a proposed plan for disseminating notice to the class, which the District Court approved. Only 55 members submitted timely opt-outs. Among

35

the class members who chose not to opt out were the named plaintiffs in the *Hobson* action.

### 8. The District Court Certifies the Class and Approves the Modified Settlement

The District Court held a final fairness hearing on June 30, 2008, during which it heard at length from class counsel and counsel for the Objectors. The Objectors argued, among other things, that (1) the Court erred when it appointed Judge Ziegler to issue an advisory opinion on the fairness of the Modified Settlement; (2) the Modified Settlement did not extract sufficient consideration for the class members' TILA/HOEPA claims (or the RESPA, RICO, and state law claims the named plaintiffs had pled); and (3) the defendants—in particular RFC and PNC Bank (the successor to CBNV)—could withstand a far greater judgment.

On August 14, 2008, the Court issued a Memorandum and Order certifying the class and approving the modified settlement. With respect to the adequacy requirement, it relied solely on its 2006 Memorandum, in which it had

> concluded that the [proposed TILA/HOEPA] claims were time-barred. Thus, Class Counsel's strategic decision to pursue other legal theories in this case in no way renders them inadequate. In any event, . . . the proposed settlement accounts

36

for the risk that some members of the class could have established sustainable TILA/HOEPA claims and provides for an award where appropriate.

As a result of these determinations, the Court never considered the creation of a subclass.

The Court then examined the fairness of the Modified Settlement in light of the factors announced in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), and concluded that they counseled in favor of approving the Modified Settlement as fair, reasonable, and adequate. It further concluded that, notwithstanding the named plaintiffs' failure to bring TILA/HOEPA claims, the Modified Settlement was fair, reasonable, and adequate because it provided "class members with additional relief for such claims, even though th[e] court found them to be time-barred."

The Objectors timely appealed to our Court.

II.    **Jurisdiction and Standards of Review**

The District Court had jurisdiction under 28 U.S.C. § 1331 because the Consolidated Amended Complaint asserted claims under federal law (*i.e.*, RESPA and RICO). *See Community Bank I*, 418 F.3d at 293–98. The Court had supplemental jurisdiction over the state law claims under 28

37

U.S.C. § 1367(a). We have appellate jurisdiction under 28 § U.S.C. 1291.

We review a district court's certification of a class for abuse of discretion. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 595 (3d Cir. 2009); *Community Bank I*, 418 F.3d at 298. A district court abuses its discretion if its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (internal quotation marks and citation omitted). However, "whether an incorrect legal standard has been used [in ruling on class certification] is an issue of law to be reviewed *de novo*." *Id.* (internal quotation marks and citation omitted); *accord Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 380 (5th Cir. 2007).

## III. Discussion

We begin by noting that several of the Objectors' claims of error underwhelm. In particular, we see nothing to support their attacks on the District Court's impartiality, or their repeated insinuations that the Court intentionally disregarded our mandate in *Community Bank I*. From our independent review of the record, the Court made great efforts to address the concerns we expressed in our prior opinion, and attempted to follow an orderly procedure on remand in ruling on class certification and the fairness, adequacy, and reasonableness of

38

the settlement.

That said, we nonetheless conclude that the proceedings on remand went off course. To provide needed context, we first discuss the legal standards that apply to the Rule 23 requirements at issue in this case, as well as the extent to which the merits of statute-of-limitations defenses may become relevant to a district court's evaluation of those requirements. We then turn to the District Court's certification decision here, and conclude that the Court—by approaching the adequacy of representation requirement as though it were ruling on a motion to amend a pleading under Rule 15(c), or a motion to dismiss under Rule 12(b)(6)—engaged in an analysis that was neither required nor contemplated by Rule 23. From there, we discuss our continuing concerns regarding whether the named plaintiffs and class counsel are adequate class representatives, paying particular attention to: (a) the statute-of-limitations problems faced by the named plaintiffs' claims (whether under RESPA, TILA, or HOEPA); and (b) class counsel's decision not to bring TILA/HOEPA claims on behalf of the class. We address finally the Objectors' argument that the Court abused its discretion in denying their renewed motion to intervene, as well as their request that we reassign this matter to a different District Court Judge on remand, both of which we reject.

A.     Class Certification

1.     Legal Standards

39

"Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate [(1)] the named plaintiffs' and [(2)] counsel's ability to fairly and adequately protect class interests." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir. 1995). Every putative class must satisfy the four requirements of Rule 23(a): (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy). Fed. R. Civ. P. 23(a)(1)–(4). If those requirements are met, a district court must then find that the class fits within one of the three categories of class actions in Rule 23(b). The District Court certified this class action under Rule 23(b)(3), which requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority).

"Confronted with a request for a settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (internal citation omitted). However, the "other specifications of [Rule 23]—those designed

40

to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.*

The sole disputed Rule 23 requirement in this case, as it was in *Community Bank I*, is adequacy of representation, both as to the named plaintiffs and their counsel. "The inquiry that a court should make regarding the adequacy of representation requisite of Rule 23(a)(4) is to determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988). This inquiry is vital, as "class members with divergent or conflicting interests [from the named plaintiffs and class counsel] cannot be adequately represented . . . ." *In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 395 (3d Cir. 2004).

"Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) . . . those questions have, since 2003, been governed by Rule 23(g)." *Sheinberg v. Sorenson*, 606 F.3d 130, 132 (3d Cir. 2010). That subsection lists several non-exclusive factors that a district court must consider in determining "counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B), including: (1) "the work counsel has done in identifying or investigating potential claims in the action," (2)

41

"counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

"Realistically, for purposes of determining adequate representation, the performance of class counsel is intertwined with that of the class representative." *Pelt v. Utah*, 539 F.3d 1271, 1288 (10th Cir. 2008). As our own Judge Aldisert has explained, "[e]xperience teaches that it is counsel for the class representative and not the named parties . . . who direct and manage [class] actions. Every experienced federal judge knows that any statements to the contrary [are] sheer sophistry." *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 n.9 (3d Cir. 1973).

> 2. Statute-of-Limitations Issues at the Class Certification Stage

Objectors argue that the District Court erred in considering the merits of the defendants' statute-of-limitations defenses to the potential TILA/HOEPA claims in ruling on class certification. As noted, the Court determined that any potential claims possessed by the class under TILA/HOEPA were not viable because they were time-barred; thus the named plaintiffs and class counsel were not inadequate for failing to bring them. Relying on the Supreme Court's decision in *Eisen v. Carlisle &*

42

*Jacquelin*, 417 U.S. 156 (1974), the Objectors contend that "the [D]istrict [C]ourt's inquiry into the merits of the TILA/HOEPA claims . . . was unnecessary for purposes of a Rule 23 analysis and cannot be sustained as permissible." (Objectors' Br., No. 08-3261, at 73.)

In *Eisen*, the Supreme Court stated that there is "nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." 417 U.S. at 177. As we explained in *Hydrogen Peroxide*, this statement in *Eisen* led to "uncertainty" as to whether district courts are categorically prohibited from evaluating the merits of a class claim at the certification stage, even where merits questions overlap with a Rule 23 requirement. 552 F.3d at 316. This tension—between a district court's obligation to make findings regarding the Rule 23 requirements, and the apparent bar on "conduct[ing] a preliminary inquiry into the merits of" a class claim—is reflected in how courts have confronted statute of limitations at the class certification stage.

In general, a "statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant." *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 8(c). Thus, many courts have refused to consider

43

statute-of-limitations issues at the class certification stage, reasoning that such an inquiry veers impermissibly into whether the named plaintiffs and the class can prevail on their claims.[13]

[13] *See, e.g.*, *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1270 (4th Cir. 1981) ("Courts passing upon motions for class certification have generally refused to consider the impact of such affirmative defenses as the statute of limitations on the potential representative's case."); *In re VMS Sec. Litig.*, 136 F.R.D. 466, 477 (N.D. Ill. 1991) ("[I]nasmuch as the statute-of-limitations defense addresses the merits of [the] plaintiff's claims, it is beyond the scope of a motion for class certification."); *In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 427 (S.D.N.Y. 1986) (reasoning that defendant's challenge to the commonality requirement, based on individual questions with respect to timeliness, was "outside the scope of Rule 23 and indeed defies the principle enunciated in *Eisen*"); *Rishcoff v. Commodity Fluctuations Sys., Inc.*, 111 F.R.D. 381, 382–83 (E.D. Pa. 1986) ("[I]ssues relating to whether certain claims may be barred by the statute of limitations are irrelevant to the question of whether a class should be certified and will not be considered in determining the propriety of allowing the case to proceed as a class action."); *Dameron v. Sinai Hosp. of Balt., Inc.*, 595 F. Supp. 1404, 1409 (D. Md. 1984) (refusing to "cloud the issue of adequate representation [under Rule 23] with the statute of limitations problem," and noting that "[i]f the named plaintiff's claim is barred by [the] statute of limitations, a proper plaintiff may be substituted to represent the class"); *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 150 (E.D. Pa. 1976) ("Since the merits of

However, our Court and other circuit courts have since rejected the proposition that *Eisen* categorically prohibits the evaluation of the merits of class claims at the certification stage. In *Hydrogen Peroxide*, we interpreted *Eisen* to mean only that a merits inquiry is precluded at the class certification stage where it "is not necessary to determine a Rule 23 requirement." 552 F.3d at 317. Indeed, as the Supreme Court recognized a few years after it decided *Eisen*,

> [e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples.

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12 (1978) (internal quotation marks and citation omitted). Thus, "[i]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001); *accord Hydrogen Peroxide*, 552 F.3d

---

a plaintiff's claim are irrelevant for the purposes of a class action motion, it is of no moment that some of the class's claims may be time barred as defendants assert.").

45

at 320 ("[B]ecause each requirement of Rule 23 must be met, a district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements.").

Situations abound where statute-of-limitations issues overlap with certain of the Rule 23 requirements. For example, defendants may contend that statute-of-limitations defenses preclude a finding of typicality under Rule 23(a), either because the named plaintiffs' claims are untimely (and thus not typical of the class), *see, e.g.*, *Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002), or because the proposed class includes numerous class members with untimely claims (rendering the named plaintiffs' timely claims atypical), *see, e.g.*, *Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002). Relatedly, defendants may oppose class certification on the ground that class members with untimely claims must rely on equitable tolling to save their claims, which presents an individual question of law and fact that could predominate over common questions under Rule 23(b)(3), *see, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160–62 (3d Cir. 2002), or challenge the predominance requirement in light of the "presence of idiosyncratic statute-of-limitations issues" among the laws of various states in a nationwide class action, *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295–96 (1st Cir. 2000).

Statute-of-limitations issues also touch the adequacy

46

requirement. *See, e.g.*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 124 (3d Cir. 1985) (named plaintiffs were inadequate representatives in class action challenging discriminatory practices in the initial assignment of newly hired employees, because "[a]ll of the named plaintiffs . . . were originally hired outside the [statute-of-] limitations period, and therefore, none ha[d] a viable complaint about discrimination in initial assignment"). Indeed, the merits of a statute-of-limitations defense to the named plaintiffs' claims may be relevant to evaluating their adequacy as class representatives in the same way any type of defense may be relevant to that inquiry, *i.e.*, named plaintiffs may be inadequate representatives if their claims are extremely weak as compared to the rest of the class. As Judge Posner explained,

> if when class certification is sought it is already apparent . . . that the class representative's claim is extremely weak, this is an independent reason to doubt the adequacy of his representation. . . . One whose own claim is a loser from the start knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit.

*Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999) (internal citations omitted). Thus, to the extent the claims of the named plaintiffs—as compared with the rest of the

47

class—are subject to fatal statute-of-limitations defenses, that inquiry may be relevant to whether they can adequately represent absent class members whose claims do not suffer from timeliness problems. *Cf. Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) ("the challenge presented by a defense unique to a class representative" is that "the representative's interest might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class").

However, the extent to which a district court may consider the merits of claims in ruling on a class-certification motion has limits. "When a district court properly considers an issue overlapping the merits in the course of determining whether a Rule 23 requirement is met, it does not do so in order to predict which party will prevail on the merits." *Hydrogen Peroxide*, 552 F.3d at 317 n.17; *see also Hassine*, 846 F.2d at 178 ("The ability of a named plaintiff to succeed on his or her individual claims has never been a prerequisite to certification of the class."). Thus, merits inquiry is not permissible "when [the] merits issue is unrelated to a Rule 23 requirement." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *see also Vallario v. Vandehey*, 554 F.3d 1259, 1266 (10th Cir. 2009) (the merits of the class claims "may not serve as the focal point of [the] class certification analysis"). Stated another way, it remains true that "[i]n determining the propriety of a class action, the question is *not whether the plaintiff or plaintiffs have*

48

*stated a cause of action* . . . but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178 (emphasis added) (internal quotation marks and citation omitted).

In the context of this precedent, we cannot agree with the Objectors that the District Court was categorically prohibited from evaluating the merits of defendants' statute-of-limitations defenses to potential TILA/HOEPA claims in ruling on class certification. We must determine, however, whether the District Court's analysis of the merits of those defenses was necessary to make findings on Rule 23 requirements—specifically here the adequacy-of-representation requirements under Rules 23(a)(4) and 23(g).

### 3.  The District Court's Analysis

As noted, the District Court interpreted our decision in *Community Bank I* as instructing it to evaluate the viability of potential TILA/HOEPA class claims before evaluating the adequacy of the named plaintiffs and their counsel. *Compare* 418 F.3d at 306 ("If the Court determines that the TILA and HOEPA claims [of class members] are viable, there may be serious questions whether the named plaintiffs' interests are sufficiently aligned with those of absent class members as required by Rule 23(a)."). The District Court's reasoning appears to be that, if these claims could not survive a Rule 12(b)(6) motion to dismiss (and thus were not viable), neither the named plaintiffs nor their counsel were inadequate for

49

failing to bring them.

a. The District Court's Relation-Back Analysis

Though the District Court purported to approach this question using a Rule 12(b)(6) standard, its analysis actually dealt with Rule 15(c), which governs the circumstances where an amended pleading "relates back to the date of the original pleading." Fed. R. Civ. P. 15(c). The Court focused on Rule 15(c)(1)(C), which governs the circumstances in which an amended pleading that "changes the party or the naming of the party against whom a claim is asserted" relates back to the date of the initial pleading. Fed. R. Civ. P. 15(c)(1)(C). Such an amended pleading only relates back if (1) it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading"; and (2) the "party to be brought in by amendment . . . knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Id.*

The Court approached the relation-back question—*i.e.*, whether an amended pleading asserting TILA/HOEPA claims could relate back to any earlier complaint—not by reference to a hypothetical amended complaint that the *existing* named plaintiffs could file, but by reference to an amended complaint filed by absent members of the class. In particular, the Court

50

focused on the complaint (and the proposed second amended consolidated complaint) filed by Counsel for the Objectors in the *Hobson* action. The Court concluded that those complaints could not possibly relate back to any complaint in the consolidated *Kessler* action for several reasons,[14]

[14] The first ground on which the District Court relied in concluding that no class member had a timely TILA/HOEPA claim was its interpretation of our decision in *Community Bank I* as directing it to "focus on whether TILA/HOEPA damage claims were timely and thus . . . viable as of the November 10, 2003 filing date" of the Consolidated Amended Complaint. The Court emphasized that in *Community Bank I*, our Court had noted—in the context of explaining why a substantial group of class members appeared to have timely TILA/HOEPA claims—that "[t]he age of the named plaintiffs' loans when the *relevant complaints* were filed ranged from twenty-eight months (in the case of [named plaintiff Thomas] Mathis) to fifty-six months (in the case of [named plaintiff Ruth] Davis)." 418 F.3d at 306–07 (emphasis added). The District Court noted that these time spans corresponded to the November 2003 filing of the Consolidated Amended Complaint; *i.e.*, Davis's loan closed on February 22, 1999 (56 months before the November 2003 Consolidated Amended Complaint), and Mathis's loan closed on June 7, 2001 (28 months before the Consolidated Amended Complaint). The District Court believed that our Court was "fully aware of the importance of this issue," and speculated that had we "intended the statute of limitations analysis to focus on any of the earlier filed complaints[,] [we] would have said so."

Unfortunately, it appears that a misplaced record citation

in our opinion in *Community Bank I* led the District Court astray. In the portion of our opinion to which the District Court referred, we cited to an October 2003 "Amended Summary Chart of the Named Plaintiffs' Recoverable Damages Under RESPA," filed as an exhibit to the Objectors' "Notice of Objections" to the class settlement. This chart set out the age of each named plaintiff's loan as of the next scheduled loan payment—*i.e.*, at the end of October 2003—apparently for the purpose of calculating damages. Unsurprisingly, the time span between the date that Mathis's and Davis's loans closed and the filing of this chart (the end of October 2003) was essentially the same as the time span between the dates those loans closed and the filing date of the Consolidated Amended Complaint (November 10, 2003).

Aside from this misstatement in our prior opinion, we struggle to see how the District Court could have "fairly read" *Community Bank I* as directing it to evaluate the timeliness question from the date of the filing of the Consolidated Amended Complaint. Our references to the "relevant complaints" throughout that opinion were to the *Davis* and *Ulrich* complaints; as noted, the Settling Parties used these dates to distinguish between class members with timely and untimely RESPA claims. *See, e.g.*, 418 F.3d at 317 n.33 (noting, in connection with the class members' RESPA claims, that "[t]he relevant complaint is *Davis* for the CBNV borrowers and *Ulrich* for the GBNT borrowers"). Indeed, our decision in *Community Bank I* makes no sense if we intended the District Court to assess the timeliness of class members' potential TILA/HOEPA claims as of the date the Consolidated Amended Complaint was

including that: (1) they named new defendants in addition to CNBV, GNBT, and RFC, and thus could not relate back under Rule 15(c)(1)(C) (because the named plaintiffs had not failed to sue those defendants as a result of any "mistake"); and (2) no complaint in the *Hobson* action could relate back to the *Davis* or *Ulrich* complaints in any event because "Rule 15(c), by its terms, only applies to amended pleadings in the same action as the original, timely pleading," *Bailey v. N. Ind. Public Serv. Co.*, 910 F.2d 406, 413 (7th Cir. 1990).

This approach appears to assume that the reasons why the existing class members chose not to plead TILA/HOEPA claims in their initial complaints, and later refused to amend their complaints to assert those claims, were irrelevant. The Court approached the adequacy question from a perspective that in effect asked whether, assuming the existing named plaintiffs were inadequate representatives for failing to bring those claims, that failure could be remedied by any other member of the class. Answering that question in the negative, the Court's analysis

---

filed. As we noted in *Community Bank I*, in March 2002 RFC announced "it was no longer willing to purchase high interest mortgage loans like the ones sold by Shumway." *Id.* at 284. Thus, the latest a class member's loan could have closed was March 2002. If so, *no* class member could have a timely TILA/HOEPA claim, as the November 2003 Consolidated Amended Complaint was filed more than one year after March 2002.

53

reduces to the conclusion that the existing named plaintiffs are made adequate because there is no remedy for their inadequate representation.

The Settling Parties advance a similar argument before us on appeal: they contend that the only way TILA/HOEPA claims could be asserted in this litigation is if "Class Counsel or the Objectors . . . s[ought] leave from the district court to add a *new* named plaintiff whose TILA/HOEPA claims had *not* expired." (Settling Parties' Br. at 79 (emphasis in original).) Moreover, because the existing named plaintiffs obviously did not fail to name any other class member as a named plaintiff as the result of a "mistake concerning the proper party's identity," Fed. R. Civ. P. 15(c)(1)(C), the Settling Parties contend that an amended pleading adding a new named plaintiff to assert TILA/HOEPA claims could not possibly relate back to any complaint in the consolidated *Kessler* action. In sum, the Settling Parties contend that every class member's potential TILA/HOEPA claim is fatally time-barred.

We need not definitively resolve here this Rule 15(c) question. As we explain further below, *see infra* Part III.A.4, the District Court—by approaching the adequacy requirements from this perspective—did not consider the serious remaining questions regarding whether (a) the named plaintiffs' interests are aligned with those of the absent class members, and (b) class counsel has "vigorously prosecuted the action" on behalf of the class. *General Motors*, 55 F.3d at 801. However, because the

Parties have devoted so much of their arguments to the Rule 15(c) issue (both before us and before the District Court), we think it appropriate to take a detour to explain our serious doubts regarding the Settling Parties' argument.

Rule 15(c)(1)(C) does not expressly refer to the addition of a new plaintiff; it facially applies only to an amendment that "changes the party or the naming of the party *against whom a claim is asserted*." Fed. R. Civ. P. 15(c)(1)(C) (emphasis added). However, our Court (and other courts) have also applied its requirements to the addition of new plaintiffs. *See Nelson v. Allegheny County*, 60 F.3d 1010, 1014 n.7 (3d Cir. 1995); *see also* Advisory Committee Notes on the 1996 Amendments to Fed. R. Civ. P. 15 ("The relation back of amendments changing plaintiffs is not expressly treated in revised rule 15(c) since the problem is generally easier [than that of amendments changing defendants]. Again the chief consideration of policy is that of the statute of limitations, and the attitude taken in . . . Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs."). The Settling Parties contend that *Nelson* is dispositive here, and would bar any new-named plaintiff in these actions from filing an amended pleading that could relate back to an earlier-filed complaint. We disagree.

In *Nelson*, anti-abortion protestors filed a class action against the City of Pittsburgh after they were arrested for protesting on the grounds of a private clinic. *Id.* at 1011. After

the District Court denied class certification, the named plaintiffs filed an amended complaint asserting individual claims. *Id.* After two more years passed, the plaintiffs filed a fourth amended complaint adding two new plaintiffs. *Id.* at 1011–12. We affirmed the District Court's dismissal of these new plaintiffs' claims as time-barred: though it was undisputed that the statute of limitations was tolled for these individuals (as well as the entire class) until the District Court denied class certification, they had waited an additional two years to add themselves as named plaintiffs in the remaining individual action, and could not satisfy Rule 15(a)(1)(C)'s requirements. *Id.* at 1013–15.

The two plaintiffs whose claims were dismissed in *Nelson* were "new parties" because, after class certification had been *denied*, they waited too long to seek to join the action through filing an amended complaint. By contrast, it is not at all clear that an absent class member in our case—assuming he or she were added as a named plaintiff to file an amended pleading asserting TILA/HOEPA claims—would constitute a "new party" for purposes of Rule 15(c).[15]

_____

[15] Aside from *Nelson*, the other cases cited by the Settling Parties in support of this argument are off point, as none involved an amended pleading in a class action that sought solely to substitute a new named plaintiff. *See Young v. Lepone*, 305 F.3d 1, 16–17 (1st Cir. 2002) (holding that amended pleading naming new plaintiffs in a *non-class action* could not

56

As the Supreme Court has explained, absent members of a class—at least in relation to an applicable statute-of-limitations period—are essentially "parties" to the class action while a certification decision is pending. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974) (when a putative class action is filed, "the claimed members of the class *st[and] as parties to the suit* until and unless they receive[] notice thereof and cho[o]se not to continue" (emphasis added)). However, under the Settling Parties' theory, an amended class complaint that adds a new named plaintiff could never relate back to the initial complaint—even where the substitution was necessary because the existing named plaintiff had died or no longer had standing to pursue claims on behalf of the class—because the failure to name that party as a plaintiff in the initial complaint was not the result of a "mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). As our Seventh Circuit colleagues have explained, such a result fails the purpose of the class action device:

> Relation back to add named plaintiffs in a class action suit is of particular importance because of the interests of the unnamed class members.

relate back under Rule 15(c)); *In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352, 1363–65 (W.D.N.Y. 1996) (holding that amended pleading in securities class action that sought to name additional plaintiffs *and defendants* could not relate back under Rule 15(c)).

Suppose Mr. X files a class action and after the statute of limitations has run the defendant settles with X. If a named plaintiff cannot be substituted for X with relation back to the date of the filing of the original complaint, the class will be barred from relief.

*Phillips v. Ford Motor Co.*, 435 F.3d 785, 788 (7th Cir. 2006).

In this context, the better conclusion may be that an amended complaint adding a class member as a new named plaintiff need only satisfy Rule 15(c)(1)(B) to relate back to an earlier complaint. Under that subsection, the plaintiff must demonstrate only that his or her TILA/HOEPA claims "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Moreover, it strikes us as straightforward that the hypothetical TILA/HOEPA claims asserted by the Objectors arose out of the same "transaction"—*i.e.*, the allegedly fraudulent disclosures (and the omitted material disclosures) made in connection with the closing of the class members' loans—as the named plaintiffs' RESPA claims.[16]

---

[16] Indeed, class counsel conceded as much in their Proposed Findings of Fact and Conclusions of Law submitted to the District Court in 2003:

Any claim, including those actually asserted by

58

Finally, even assuming an amended pleading adding a class member as a new named plaintiff could not relate back under Rule 15(c), the "class action tolling" doctrine—over which the Objectors have spilled a considerable amount of ink before our Court and the District Court—may come into play. In *American Pipe & Construction Co.*, the Supreme Court held that where class certification has been denied because of the failure to demonstrate that the class was sufficiently numerous, "the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." 414 U.S. at 553. The Court explained that refusing tolling in such a circumstance would

> frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach

---

> plaintiffs and the alternative claims that the objectors allege should have been asserted, would derive from the same factual predicate: that plaintiffs were charged excessive origination fees and excessive fees for title services in connection with their second mortgage loans.

59

them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties—precisely the multiplicity of activity which Rule 23 was designed to avoid in those cases where a class action is found "superior to other available methods for the fair and efficient adjudication of the controversy."

*Id.* at 551 (quoting Fed. R. Civ. P. 23(b)(3)). The Court later extended its holding in *American Pipe* to "all asserted members of the class, not just as to interveners." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (internal quotation marks and citation omitted).

Our Court has applied *American Pipe* tolling in other circumstances. In *Haas v. Pittsburgh National Bank*, 526 F.2d 1083 (3d Cir. 1975), we held that the "broad tolling principle" in *American Pipe* applied to the claims of a named plaintiff substituted for the initial lead plaintiff (who, the District Court concluded, lacked standing after the class had been certified). *Id.* at 1097. In *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380 (3d Cir. 2002), we held that *American Pipe* tolling applied to an intervener seeking to become lead plaintiff in a class action where the District Court had previously denied class certification "for reasons unrelated to the appropriateness of the substantive claims for certification." *Id.* at 389. Finally, in *Yang v. Odom*, 392 F.3d 97 (3d Cir. 2004), we extended our

application of *American Pipe* tolling in *McKowan* to the filing of a subsequent class action "where certification was denied in the prior suit based on the lead plaintiffs' deficiencies as class representatives." *Id.* at 99. In light of these precedents, the Objectors' argument seems to be that, if the named plaintiffs were judged inadequate based on their failure to bring TILA/HOEPA claims on behalf of the class, the class action tolling doctrine would toll the statute of limitations with respect to those claims in either (1) a subsequent action or (2) the current action (following substitution or intervention of a new named plaintiff after the class is decertified).

The Settling Parties counter that class action tolling would be unavailable to the Objectors—even if class certification in the consolidated *Kessler* action were denied due to inadequate representation—because no TILA/HOEPA claims have been asserted in that action. They note that some courts have suggested that class action tolling only applies to claims that are identical to those asserted in the initial class action that was decertified. *See Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1283 (11th Cir. 2003); *Weston v. AmeriBank*, 265 F.3d 366, 368–69 (6th Cir. 2001); *Spann v. Community. Bank of N. Va.*, No. 03-C-7022, 2004 WL 691785, at *4–7 (N.D. Ill. Mar. 30, 2004); *Southwire Co. v. J.P. Morgan Chase & Co.*, No. MDL 1303, 2004 WL 414799, at *18 (W.D. Wis. Mar. 3, 2004); *see also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 467 (1975) (noting that "the tolling effect given to the timely prior filings in *American Pipe* . . . depended heavily on the fact that

61

those filings involved exactly the same cause of action subsequently asserted").

However, there is a competing line of authority on that question.[17] *See Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987) ("Notwithstanding the differences between the legal theories advanced by plaintiffs in the state court action and those advanced in the present action, we are persuaded that the *American Pipe* doctrine has applicability to the present action."), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987); *Tosti v. City of L.A.*, 754 F.2d 1485, 1489 (9th Cir. 1985) ("We find no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled."); *accord, e.g.*, *Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 180 (D. Mass. 2009); *In re Enron Corp. Sec. Litig.*, 465 F. Supp. 2d 687, 717–19 (S.D. Tex. 2006); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528–29 (M.D. Fla. 1998)*; In re Indep. Serv. Orgs. Antitrust Litig.*, No. MDL 1021, 1997 WL 161940, at *3–6 (D. Kan. Mar. 12, 1997). These Courts have reasoned that, where claims brought in a subsequent suit share a common factual and legal nexus with those brought

[17] Though our Court has not yet weighed in on this debate, we have agreed that a "substantively identical" class action filed after the denial of class certification due to deficiencies of the class representative qualifies for class action tolling. *Yang*, 392 F.3d at 112.

in the prior class action, there is no persuasive reason for refusing to apply class action tolling, as the defendant will already have received adequate notice of the substantive nature of the claims against it and likely would rely on the same evidence and witnesses in mounting a defense. *Cf. Crown, Cork & Seal*, 462 U.S. at 355 (Powell, J., concurring) (cautioning that class action tolling should apply only to subsequent claims that "concern the same evidence, memories, and witnesses as the subject matter of the original class suit" (internal quotation marks and citation omitted)). Under this theory, the Objectors have a strong argument that their TILA/HOEPA claims could qualify for class action tolling, as those claims appear to share a common factual and legal nexus with the RESPA claims the named plaintiffs have asserted; *i.e.*, both claims are predicated on defendants' alleged predatory lending scheme and the charging of fraudulent and excessive closing fees.

In the end, we need not resolve in this case the difficult questions of whether (1) a substituted named plaintiff in a class action may file an amended pleading that relates back to the initial pleading only if he or she can satisfy the requirements of Rule 15(c)(1)(C), or (2) the class action tolling doctrine would apply in a subsequent class action—or to the claims of a new, substituted named plaintiff in that same action—following a determination that the named plaintiffs were inadequate for failing to plead potentially meritorious claims on behalf of the class. We simply note that the Court's apparent conclusion—that the failure to assert colorable TILA/HOEPA

claims could not be remedied through any mechanism, even assuming that the class representatives were inadequate for failing to bring those claims (and despite their being released as part of the settlement)—is a path we find troubling.

### b. The District Court's Equitable Tolling Analysis

Aside from the District Court's Rule 15(c) analysis, it also determined, while purportedly applying a Rule 12(b)(6) standard, that no class member could rely on equitable tolling to save an otherwise untimely TILA/HOEPA claim.[18] The Court

---

[18] We pause to acknowledge our own error in *Community Bank I*, where we incorrectly suggested that the three-year limitations period for claims for rescission under TILA was a statute of limitation "subject to equitable tolling." 418 F.3d at 305. In *Beach v. Ocwen Federal Bank*, 523 U.S. 410 (1998), the Supreme Court held that the three-year period in 15 U.S.C. § 1635(f)—which provides that the right of rescission "shall expire" three years after the loan closes, *id.*—is not a statute of limitations, but a statute of repose, *i.e.*, one "governing the life of the underlying right." 523 U.S. at 417.

The Objectors—primarily those from Maryland, Appeal No. 08-3791, represented by the Legg Law Firm, LLC—challenge the District Court's conclusion that a classwide claim for rescission could not be asserted in the consolidated *Kessler* action, arguing that (1) even if equitable tolling could not apply to save any class member's claim, class action tolling

64

reasoned that no class member could show any "active misleading"—apart from the alleged fraudulent disclosures and omissions in the HUD-1 Statements provided to borrowers by the defendant banks—necessary to support the invocation of equitable tolling based on a fraudulent concealment theory.

We are concerned that the District Court—in the context of making a determination as to class certification under Rule 23—concluded, as a matter of law and finding of fact, that no member of the 44,000 person class could rely on equitable tolling to save an otherwise untimely TILA/HOEPA claim. Moreover, we have doubts regarding the Court's conclusion even if a Rule 12(b)(6) analysis were appropriate. It relied on our decision in *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994), an employment discrimination case, where we affirmed the dismissal (under Rule 12(b)(6)) of an untimely failure-to-hire claim, noting that "nowhere in the complaint [did the plaintiff] allege that [her employer] misled her, actively or otherwise, with respect to this claim." *Id.* at 1391 n.10. However, we also vacated the dismissal of the

could; and (2) contrary to the Court's finding that no class member had asserted his or her rescission rights, there is in fact a small group of class members who timely submitted rescission demands to their lenders. We need not resolve that dispute; as we discuss later, *see infra* at 82 n.27, we agree with the District Court that class counsel is not inadequate for declining to pursue a classwide rescission claim.

plaintiff's untimely discriminatory discharge claim, noting that the equitable tolling issue "was raised in the context of a motion to dismiss pursuant to [Rule] 12(b)(6)," and, "[t]herefore, all that was required of [the plaintiff] at this stage was that she plead the applicability of the doctrine," which she had done. *Id.* at 1391–92 (listing the "factual inquiries [that] must be undertaken before a proper resolution of the equitable tolling issue can be reached").

Indeed, our Court (and our sister circuit courts) have reasoned that, because the question whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) motion. *See, e.g.*, *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003–04 (9th Cir. 2006) ("Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue."); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) (rejecting RFC's argument that plaintiffs' claims were "untimely under the one-year periods of limitations contained in both the TILA and the RESPA," and noting that "because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)").

In any event, whether the type of fraudulent concealment alleged by the Objectors (and, as we discuss below, that asserted

66

by the named plaintiffs in connection with their untimely RESPA claims) can, as a matter of law, provide a successful basis for equitable tolling under TILA/HOEPA was not before the District Court.[19] Its analysis of the merits of the equitable

---

[19] We perceive an even more fundamental problem with the application of a Rule 12(b)(6) standard here: *i.e.*, it is not clear to what pleading the Court should have applied that standard. *Cf.* Robin J. Effron, *The Plaintiff Neutrality Principle: Pleading Complex Litigation in the Era of Twombly and Iqbal*, 51 Wm. & Mary L. Rev. 1997, 2022 (2010) ("The procedural differences between a Rule 12(b)(6) motion to dismiss and a Rule 23 certification proceeding . . . indicate that there would be some practical problems in applying the *Twombly/Iqbal* [plausibility] standard in the class certification context. Namely, to what documents would the standard apply?"). Indeed, even the Settling Parties appear to acknowledge that a Rule 12(b)(6) analysis is here a bridge too far. *See* Settling Parties' Br. at 49 ("[T]he whole thrust of the Objectors' complaints (then and now) is that *no . . . TILA/HOEPA claims were pleaded* in the Consolidated Amended Complaint. A Rule 12 motion to dismiss thus would have been a *spectacularly inappropriate way* to determine the viability of *hypothesized* claims that *had never been pleaded*." (emphases in original)).

In addition, it appears that the District Court relied only on the briefs filed by the defendants, and not class counsel, in connection with its viability inquiry. This no doubt is concerning, as it comes close to relieving the named plaintiffs and class counsel of their burden to prove that the Rule 23 requirements were met. *See, e.g.*, *Johnston v. HBO Film Mgmt.,*

tolling theory advanced by the Objectors was essentially an inquiry into "which party [would] prevail on the merits" of the TILA/HOEPA claims the Objectors sought to assert.[20]

*Inc.*, 265 F.3d 178, 183 (3d Cir. 2001).

[20] We note that, to the extent the District Court should not have considered the merits of defendant's statute-of-limitations defenses in making its class certification decision, that error was certainly encouraged by counsel for the Objectors. Indeed, it was those very counsel who urged the Court to use a Rule 12(b)(6) standard in assessing the viability of their proposed TILA/HOEPA claims (though the Objectors contend the statute-of-limitations defenses should not be a part of that analysis). Though counsel for the Objectors now complain that the Court's viability briefing was "amorphous and unstructured," they were members of the Steering Committee the Court assigned to establish that briefing structure, and in any event they have not explained how a "properly structured motion to dismiss or motion for summary judgment" would have been a more appropriate procedure on remand. (Objectors' Br., No. 08-3621, at 38–39.)

In this light, the Settling Parties contend that the Objectors should be estopped from challenging the District Court's viability analysis, or be deemed to have waived any such challenge. We disagree. "While a party can waive his or her ability to appeal a ruling for failure to object, there can be no waiver . . . of the Judge's duty to apply the correct legal standard." *United States v. Ali*, 508 F.3d 136, 144 n.9 (3d Cir. 2007). Nor can a party "'waive' the proper standard of [our

*Hydrogen Peroxide*, 552 F.3d at 317 n.17.

\* \* \* \* \*

In sum, the Rule 23 requirements "differ in kind from legal rulings under Rule 12(b)(6)" (and, for that matter, Rule 15(c)). *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). We conclude that the merits inquiries the District Court conducted here—*i.e.*, whether a new plaintiff could file an amended pleading asserting TILA/HOEPA claims consistent with Rule 15(c), or adequately plead a basis for equitable tolling under Rule 12(b)(6)—were unnecessary to evaluate the adequacy requirement under Rule 23(a)(4).

---

appellate] review." *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008). This is particularly true in the class action context, where "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members[.]" *General Motors*, 55 F.3d at 785 (internal quotation marks and citation omitted); *see also Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002) (rejecting argument that defendant had waived challenge to class representative's adequacy by not raising it in the District Court, and noting that, "[e]ven if [the defendant] had stipulated to certification, the court was bound to conduct its own thorough [R]ule 23(a) inquiry"). Thus, while we certainly agree that the Objectors are partly to blame for the approach the District Court took, we cannot agree that the Court's analysis is thereby insulated from our appellate review.

### 4.    Adequacy of Representation

As discussed, we conclude that the District Court incorrectly evaluated the adequacy of the named plaintiffs and class counsel.    Added to that, we continue to have concerns—essentially the same as those we identified in *Community Bank I*—regarding whether the named plaintiffs and their counsel are adequate class representatives.    To aid the Court on remand, we explain our concerns (and the inquiries we think worthwhile to consider) below, focusing specifically on (a) the apparent intra-class conflict with respect to the statute-of-limitations problem, which may raise questions regarding the named plaintiffs' adequacy under Rule 23(a)(4); and (b) class counsel's justifications for the decision not to assert TILA/HOEPA claims on behalf of the class, which may raise questions regarding counsel's adequacy under Rule 23(g).

#### a.    The Class Representatives

As noted, the adequacy requirement is designed "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.  Here, there is an obvious and fundamental intra-class conflict of interest (the same we identified in *Community Bank I*): the named plaintiffs' claims—whether under RESPA, TILA, or HOEPA—are untimely, and they must rely on equitable tolling to save them.  Notwithstanding that substantial hurdle to their claims, they seek to represent a sizeable subgroup of the

70

class—approximately 14,000 persons—with timely claims. *Cf. McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101, 2007 WL 2702348, at *12 (E.D.N.Y. Sept. 12, 2007) (holding that named plaintiffs in a TILA class action were inadequate representatives because their claims were time-barred).

As noted, a claim for damages under TILA and HOEPA—just like a claim for damages under RESPA, *see* 12 U.S.C. § 2614—is subject to a one-year limitations period that begins to run from the date the loan closed, 15 U.S.C. § 1640(e). There are 19 named plaintiffs in the consolidated class actions before us. Each named plaintiff's loan closed more than one year before either the *Davis* action (with respect to the Plaintiffs who received their loans from CBNV) or the *Ulrich* action (with respect to the Plaintiffs who received their loans from GNBT) was filed.[21] (As noted, the Settling Parties used the filing dates

[21] The named plaintiffs who received loans from CBNV, and the dates their loans closed, are: Ruth Davis (Feb. 22, 1999), Phillip and Jeanine Kossler (July 28, 1998), William and Ellen Sabo (Oct. 15, 1999), John and Rebecca Picard (Nov. 30, 1999), Brian and Carla Kessler (Apr. 30, 1999), and Nora H. Miller (Apr. 30, 1999).

The named plaintiffs who received loans from GNBT, and the dates their loans closed, are: Russell and Kathleen Ulrich (Aug. 8, 2000), Thomas Mathis (June 7, 2001), Stephen and Amy Haney (May 23, 2001), Patrice Porco (Sept. 9, 2000), Robert and Rebecca Clark (Mar. 1, 2001), and Edward Kruska (May 5, 2001).

71

of these actions to distinguish between class members with timely RESPA claims, and those who would have to rely on equitable tolling, for purposes of distributing the Initial and Modified Settlements.) Accordingly, not only is every named plaintiff's potential claim for damages under TILA/HOEPA time-barred, the RESPA claims the named plaintiffs did bring are also time-barred, and they must rely on equitable tolling to prevail on either type of claim. By contrast, a significant percentage of class members' loans closed within one year of the *Davis* or *Ulrich* complaint, and they need not rely on equitable tolling—a doctrine that courts approach "warily," *Seitzinger v. Reading Hosp. and Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999)—to save their timely, and thus more valuable, claims. *Cf. Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) (class which included class members whose asbestos claims arose before and after the defendant's insurance policy expired should have been divided into subclasses, as those class members whose claims arose before the policy expired "had more valuable claims" than those whose claims arose after).

The terms of the Modified Settlement exemplify this conflict of interest, at least with respect to the potential TILA/HOEPA claims. *See General Motors*, 55 F.3d at 801. Though the Modified Settlement (like the Initial Settlement) distinguishes between class members whose loans closed within and outside of one year before the *Davis* and *Ulrich* complaints were filed (for purposes of the RESPA claims), it apportions the additional monies paid to reflect potential TILA/HOEPA

72

damages claims as though *every* class member is required to establish a basis for equitable tolling to be eligible for relief. As noted, that is not the case. Accordingly, the District Court's apparent "conclusion that the settlement—which (supposedly) maximized class recovery—satisfied the requirement that class members' interests not be antagonistic ignores the conspicuous evidence of such an intra-class conflict in the very terms of th[e] settlement." *Id.* at 800–01.

The District Court—having determined that no other class member could assert a timely TILA/HOEPA claim under Rules 15(c) and 12(b)(6)—did not consider this intra-class conflict. It should do so on remand. As we noted in *Community Bank I*, however, this intra-class conflict is by no means fatal to whether these cases can be maintained as a class action. The most obvious remedy would be to create subclasses, as we suggested in our prior opinion. *See Community Bank I*, 418 F.3d at 310 ("[I]f the District Court were to find [on remand] that class certification is appropriate, the Court should determine whether sub-classes are necessary or appropriate . . . ."); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009).

b.    Class Counsel

"Courts examining settlement classes have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and

73

(3) acted at arm's length from the defendant." *General Motors*, 55 F.3d at 801. We did not elaborate in *Community Bank I* on the type of inquiry a district court should engage in when addressing class counsel's adequacy in light of the decision to bring some, but not other, potentially colorable claims on behalf of the class, and we need not do so definitively here. For present purposes, it is sufficient to note a few general principles.

First, a "mere disagreement over litigation strategy . . . does not, in and of itself, establish inadequacy of representation." *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987); *see also, e.g.*, *United States v. City of N.Y.*, 198 F.3d 360, 367 (2d Cir. 1999) ("Representation is not inadequate simply because [an attorney denied appointment as class counsel] . . . ha[s] different views on the facts, the applicable law, or the likelihood of success of a particular litigation strategy"); *Daggett v. Comm'n on Governmental Ethics and Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) (noting that "the use of different arguments as a matter of litigation judgment is not inadequate representation *per se*"); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) ("The fact that [objecting class members] do not approve of the settlement terms does not, of itself, demonstrate that . . . class counsel provided inadequate representation."). Were it otherwise, disagreements over strategy "would require decertification any time an objection is raised to a class, certainly not the standard envisioned by Rule 23." *Id.* at 1175.

74

As Rule 23 makes clear, however, "the work counsel has done in identifying or investigating potential claims in the action" is an important factor when evaluating class counsel's adequacy. Fed. R. Civ. P. 23(g)(1)(A)(i). Though we certainly agree that class counsel is not inadequate simply because they have not asserted every claim that could theoretically be pled against a defendant, *cf. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2005), neither is the decision regarding the claims to assert in the action totally shielded from judicial scrutiny.[22] In particular, where class counsel's proffered reasons for the "strategic" decision not to bring certain claims—*i.e.*, obstacles faced by the claims, either as to certification or proof—also apply to the claims that have been

[22] Though not addressed by the parties, similar issues arise where objecting class members challenge a class representative's adequacy in light of the representative's decision not to join as a defendant an entity against whom a colorable claim could be asserted. In such cases, courts have considered whether the decision not to join a particular defendant could be characterized as "strategic," or, if not, is indicative of antagonistic interests between the named plaintiffs, their counsel, and certain absent class members. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 135 (5th Cir. 2005); *Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 611 (E.D. Wis. 2000); *Dubin v. Miller*, 132 F.R.D. 269, 273 (D. Colo. 1990) (though "a class plaintiff need not join *every* possible defendant, plaintiff is obligated to supply a persuasive reason for the non-joinder" (emphasis in original)).

75

asserted, a district court may have reason to question whether class counsel has "vigorously prosecuted the action" on behalf of the class. *General Motors*, 55 F.3d at 801.

In that light, we believe that the statute-of-limitations justification for class counsel's decision not to bring TILA/HOEPA claims—the only hurdle to pleading those claims that the District Court considered—deserves more scrutiny. For example (and as discussed previously), the Settling Parties (including class counsel) contend that no class member—including the named plaintiffs—could rely on equitable tolling to save a potential TILA/HOEPA claim. This position is surprising, as class counsel has taken the opposite position with respect to the named plaintiffs' untimely RESPA claims.[23]    In their Consolidated Amended

---

[23] In addition, the Settling Parties—despite their agreement that the filing date of the *Davis* complaint would be used to distinguish between CBNV borrowers with timely and untimely RESPA claims—now dispute before us that any amended pleading asserting TILA/HOEPA claims could relate back to the initial *Davis* complaint.  They contend that, because that complaint asserted claims only on behalf of a putative statewide class of CBNV-borrowers, any amended complaint asserting TILA/HOEPA claims on behalf of the nationwide class could only relate back to the second amended complaint in *Davis* (filed on June 12, 2002), which broadened the scope to a putative quasi-nationwide class of CBNV borrowers. *See Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131–33 (11th

Cir. 2004) (holding that an amended complaint expanding the class action to assert a nationwide class did not relate back under Rule 15(c) to the initial complaint, which asserted only a statewide class).  As a result, the Settling Parties estimate that the "actual number of borrowers whose loans closed within one year of the filing of the first complaints alleging multistate classes" is approximately 8,451 (rather than 14,000).  (Settling Parties' Br. at 74.)

As noted, however, this position, which class counsel (along with defendants) have now taken with respect to the TILA/HOEPA claims, directly conflicts with the position taken for the RESPA claims (as illustrated by the terms of the Initial and Modified Settlements).  That is, if CBNV borrowers cannot rely on the filing date of the *Davis* complaint to make their potential TILA/HOEPA claims timely, neither may they do so with respect to the RESPA claims that the named plaintiffs have asserted in this litigation.

Moreover, there appears to be conflicting authority regarding whether an amended pleading asserting a nationwide class can relate back to an initial pleading asserting a smaller class.  The Seventh Circuit Court has concluded, though in the context of determining whether removal under the Class Action Fairness Act was appropriate, that an amended pleading expanding a statewide class action to a nationwide class action does not result in the "commencement" of a new suit because such an amended pleading relates back to the first pleading.  *See Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 334 (7th Cir. 2005) ("[T]he expansion of a proposed class does not change the parties to the litigation nor does it add new claims."); *see also*

Complaint, the named plaintiffs specifically alleged facts suggestive of fraudulent concealment as to the class's RESPA claims, including that the defendants concealed, among other things, (1) the actual recipient of the origination fees charged, and (2) "[t]he fact that virtually no services were performed in exchange for the supposed 'title fees' imposed upon Plaintiffs and the Class." The Objectors rely on similar allegations to toll on equity grounds the TILA/HOEPA claims, including that the defendants (1) falsely represented on the HUD-1A Settlement Statements that they were charging the borrower for title "abstracts" and "examinations," when in reality the charges were for "property reports"; and (2) intentionally concealed documents from borrowers that would have revealed these facts. In that light, the Settling Parties' description of the basis for the Objectors' equitable tolling theory—that "the banks should have disclosed that the title companies [employed by defendants] were not providing any services in exchange for the title examination fee or the alleged markup of the title abstract fee" (Settling Parties' Br. at 91)—applies equally to the named

_____

*Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 751 (7th Cir. 2005) ("Amendments to class definitions do not commence new suits."). Though we need not resolve this question here, we simply note again the seemingly inconsistent positions that class counsel has taken with respect to the RESPA claims that have been pled and the TILA/HOEPA claims that have not.

78

plaintiffs' equitable tolling theory for their RESPA claims.[24]

---

[24] Though we do not resolve the question in this case, we note that the Settling Parties' theory of fraudulent concealment—*i.e.*, that fraudulent concealment requires some further act than the failure to disclose information that would reveal the fraudulent nature of origination or title fees, or misrepresenting the nature of those fees—would effectively render equitable tolling in the RESPA, TILA, or HOEPA context a dead letter. *Cf. Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 708 (11th Cir. 1998) (disallowing equitable tolling via a fraudulent concealment doctrine for TILA claims "would lead to the anomalous result that a statute designed to remediate the effects of fraud would instead reward those perpetrators who concealed their fraud long enough to time-bar their victims' remedy"); *accord Ramadan*, 156 F.3d at 502.

Notably, class counsel recently took the opposite position in a separate lawsuit asserting RESPA claims. *See Bradford v. WR Starkey Mortg., LLP*, No. 06-CV-86, 2008 WL 4501957, at *3 (N.D. Ga. Feb. 22, 2008) (agreeing with plaintiffs that "[t]he HUD-1 Statement does not accurately reflect defendant's charges, and the dissemination of documents concealing this information constitutes an affirmative act of concealment that justifies tolling the statute of limitations"); *accord Pedraza v. United Guar. Corp.*, 114 F. Supp. 2d 1347, 1357 (S.D. Ga. 2000); *see also Haynes v. HomeEq Servicing Corp.*, No. 04-1081, 2006 WL 2167375, at *5 (M.D. Tenn. Aug. 1, 2006) ("[A]ctions based on fraud, or in which a fraud was self-concealing, d[o] not require further fraudulent acts."); *Veal*

Class counsel's position is all the more surprising because, in contrast to claims under the TILA, our Court has never addressed whether RESPA claims are subject to equitable tolling, and there is conflicting circuit court precedent on the question. *Compare Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1166–67 (7th Cir. 1997) (holding that RESPA's statute of limitations is subject to equitable tolling), *with Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1038 (D.C. Cir. 1986) (holding that RESPA's statute of limitations is "a jurisdictional prerequisite to suit and as such not subject to equitable tolling"); *see also Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 424 & n.18 (6th Cir. 2009) (reserving the question of whether RESPA's statute of limitations is subject to equitable tolling); *Snow*, 332 F.3d at 361 n.7 (same).

We acknowledge that the time-bar problem was not class counsel's only justification for declining to bring TILA/HOEPA claims against the defendants. As we discussed in *Community Bank I*, those additional justifications were: (1) most of the putative class members had executed HOEPA disclosure forms; (2) TILA/HOEPA claims could not be certified as a class action because of individualized issues that could predominate; and (3)

---

*v. Crown Auto Dealerships, Inc.*, No. 04-CV-323, 2006 WL 435693, at *3 (M.D. Fla. Feb. 21, 2006) ("It can be reasonably inferred from Plaintiff's allegations that because of the alleged inadequate disclosures, he was not aware of his TILA cause of action within one year of the [transaction].").

establishing actual damages on a classwide basis would be difficult because a TILA claim for actual damages requires proof of detrimental reliance.[25]  418 F.3d at 305.[26]  The Settling Parties jointly advance several additional reasons on appeal, including (and notwithstanding the fact that they engaged in no formal discovery on remand) the supposed discovery of "significant evidence" rebutting the Objectors' theory that no title services were performed in exchange for the fees charged.

[25] We note that, since *Community Bank I*, our Court has held that detrimental reliance is an element of a claim for actual damages under TILA.  *See Vallies v. Sky Bank*, 591 F.3d 152, 158 (3d Cir. 2009) ("Without detrimental reliance, only statutory damages are available [under TILA].").

[26] In *Community Bank I*, we intimated that "[t]he District Court, on analysis, may find that these *ex post* rationales are not compelling."  418 F.3d at 305.  First, we noted that a signed disclosure acknowledgment may not necessarily be dispositive of a lender's (or assignee's) liability under HOEPA for failing to provide the required disclosures within the requisite three-day period.  *Id.* (citing 15 U.S.C. §§ 1639(a)(2)(A), 1641(d)).  Second, we believed that the Settling Parties had provided "no persuasive support for the proposition that TILA and HOEPA claims cannot be asserted as part of a class action," and noted that the statute "explicitly contemplates the possibility of a class action suit." *Id.* (citing 15 U.S.C. § 1640(a)(2)(B)).  Finally, we were skeptical that the need to prove detrimental reliance was an individualized issue that could preclude class treatment.  *Id.*

(Settling Parties' Br. at 106.)

We emphasize that the determination of whether class counsel is adequate, including whether they acted reasonably in declining to assert certain potential claims on behalf of the class, is committed to a district court's sound discretion, as it is in a better position than we to evaluate class counsel's performance. Unfortunately, the District Court, with one exception,[27] did not discuss any of class counsel's justifications for declining to

[27] That exception is class counsel's decision not to plead claims for rescission under TILA. As the District Court recognized, other circuit courts that have addressed the issue are unanimous that a claim for rescission under TILA cannot be maintained on a classwide basis. *See Andrews v. Chevy Chase*, 545 F.3d 570, 574 (7th Cir. 2008) ("The variations in the transactional 'unwinding' process that may arise from one rescission to the next make it an extremely poor fit for the class-action mechanism."); *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 421, 423 (1st Cir. 2007) (reasoning that "[t]he rescission process is intended to be private, with the creditor and debtor working out the logistics of a given rescission," and concluding that "Congress did not intend rescission suits to receive class-action treatment"); *James v. Home Constr. Co. of Mobile*, 621 F.2d 727, 731 (5th Cir. 1980) (same). Though we need not weigh in here on that question, we agree with the District Court that, in light of this authority, class counsel was not inadequate for declining to pursue a classwide rescission claim on remand.

assert TILA/HOEPA claims, instead focusing solely on the statute-of-limitations arguments advanced by the defendants. *See* Settling Parties' Br. at 111 (acknowledging that the District Court "elected not to reach these arguments in light of its determination that the claims were time-barred"). We do not deal with those justifications in the first instance, and remand for the Court to do so. *Cf. Hydrogen Peroxide*, 552 F.3d at 307 ("In deciding whether to certify a class under Fed. R. Civ. P. 23, the district court must . . . consider all relevant evidence and arguments presented by the parties.").

We again stress that we do not hold that class counsel are necessarily inadequate representatives for the class (or any subclass that is created). We conclude, however, that class counsel's justifications for their decision not to plead TILA/HOEPA claims against the defendants on behalf of the class merit closer scrutiny.

### 5.    The North Carolina Objectors

We turn to the objections to the District Court's certification decision lodged by three class members from North Carolina (Troy Elliott, Lorraine Oswald, and Ruth Mathis-Wisseh),[28] represented by Jerome Hartzell of the North Carolina

---

[28] There are approximately 800 North Carolina class members who received loans from CBNV and are members of the settlement class in the consolidated class actions before us.

83

law firm Hartzell & Whiteman, LLP. These class members argue that the Court abused its discretion in determining that the named plaintiffs were adequate class representatives for class members from North Carolina.

We have not yet discussed the unique procedural history applicable to the North Carolina Objectors, and only briefly do so here. In September 2001, Mr. Elliott and another individual—Travis Bumpers[29]—filed a putative class action against CBNV and Chase Manhattan Bank in the Superior Court of Wake County, North Carolina (*Bumpers v. Community Bank*), asserting state law claims under North Carolina's Unfair Trade Practices Act. *See* N.C. Gen. Stat. § 75-1.1. The case was removed on the basis of alleged federal preemption and then remanded back to state court.

In May 2003, the *Bumpers* plaintiffs moved for class certification in state court. In June 2003, the defendants removed the case again to federal court, and the plaintiffs again moved to remand. The case was then voluntarily transferred to the District Court in our case for inclusion as part of the MDL proceeding. In addition, the District Court permitted the *Bumpers* plaintiffs to intervene in the consolidated *Kessler* action.

---

[29] Mr. Bumpers opted out of the class, and thus is not a party to these appeals.

From December 2005 onward, counsel for the *Bumpers* plaintiffs repeatedly requested that the District Court rule on its 2003 motion to remand. At the same time, counsel filed a motion (in March 2006) in the consolidated *Kessler* action in support of the creation of a separate subclass of North Carolina borrowers. In addition, the Attorney General of North Carolina submitted a statement to the District Court opposing "the uniform settlement in *In re Community Bank* to the extent that it proposes to treat North Carolina borrowers the same as other class members who are not entitled to the protections of North Carolina law."

In January 2008 (and before the class was re-certified and the Modified Settlement approved), the District Court finally ruled on and granted the 2003 motion to remand. The Court simultaneously denied as "moot" the North Carolina Objectors' motion for a subclass of North Carolina borrowers.

On remand in North Carolina state court, the *Bumpers* plaintiffs (1) filed a motion for summary judgment, and (2) pursued their May 2003 motion for class certification. However, in March 2008, the District Court granted defendants' motion to enjoin the state class proceedings in *Bumpers*.

Though class proceedings were enjoined, the named plaintiffs in *Bumpers* proceeded with their motion for summary judgment. The North Carolina Superior Court granted partial summary judgment in favor of Bumpers and Troy Elliott,

concluding that CBNV had violated North Carolina's Unfair Trade Practices Act in two ways: (1) by charging a "loan discount fee" for providing a loan that was not in fact discounted; and (2) assessing "settlement charges" that were "redundant fees covering the same services and duplicative of the 'origination fees' charged by" CBNV. *Bumpers v. Community Bank of N. Va.*, 695 S.E.2d 442, 444 (N.C. 2010). The Court awarded damages in the amounts of $10,401.67 and $10,999, respectively, to Bumpers and Elliott.[30]

Counsel for the *Bumpers* plaintiffs then filed objections to certification and approval of the Modified Settlement in the consolidated *Kessler* action, and appeared at the June 2008 final fairness hearing. Counsel argued that the North Carolina borrowers' state law claims were uniquely valuable because: (1) they are subject to mandatory treble damages, *see* N.C. Gen.

---

[30] CBNV appealed that judgment, but the North Carolina Court of Appeals dismissed it, ruling that the appeal was interlocutory because the Superior Court's order expressly left the issue of attorneys' fees to be decided. *Bumpers v. Community Bank of N. Va.*, 675 S.E.2d 697 (N.C. Ct. App. 2009). After oral argument in the current appeals, the Supreme Court of North Carolina reversed the Court of Appeals' decision, and concluded that "an unresolved request for attorney fees does not prevent finality of a judgment disposing of all issues in the underlying substantive claim." *Bumpers*, 695 S.E.2d at 446. As of this writing, the Court of Appeals on remand has not yet ruled on the merits of the appeal.

Stat. § 75-16; (2) a four-year statute of limitations applies to those claims, *id.* § 75-16.2, a far more generous limitations period than under RESPA or TILA/HOEPA; and (3) there was now demonstrable evidence of the unique value of these claims, as the *Bumpers* plaintiffs had engaged in extensive discovery in state court, proven liability, and won significant, trebled damages.

The District Court did not address the North Carolina Objectors' arguments until the very end of its August 2008 Memorandum approving the settlement. The Court stated:

> Remarkably, [counsel for the plaintiffs in *Bumpers*] now objects to the settlement because we did not create a sub-class of North Carolina borrowers. The sole purpose of the requested sub-class would be to assert the same North Carolina state law claims over which they previously argued—<u>successfully</u>—that this court has no subject matter jurisdiction. This objection is without merit.

(Emphasis in original.)

We agree with the North Carolina Objectors that, to the extent the District Court rejected their adequacy challenge based on its perceived lack of subject matter jurisdiction over their state law claims, it erred. As our Court has held, "a judgment

87

pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action. This is true even though the precluded claim was not presented, *and could not have been presented*, in the class action itself." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) (emphasis added). It follows that absent class members with claims being released as part of a class settlement, even those over which a district court lacks subject matter jurisdiction, are not barred from challenging the adequacy of class representatives or the fairness of the settlement.

The Settling Parties counter that the District Court was not required to "appoint named class representatives from every state in order to approve a settlement that releases state law claims." (Settling Parties' Br. at 140.) We no doubt agree with that statement, but this was not the argument made to the District Court.[31] Though we express no opinion on whether the

---

[31] We are not persuaded by the Settling Parties' suggestion that any adequacy-of-representation problem was cured because North Carolina borrowers dissatisfied with the Modified Settlement could have opted out of the class. *Cf. In re Diet Drugs*, 431 F.3d at 145 ("In a class where opt out rights are afforded, [due process] protections are adequate representation by the class representatives, notice of the class proceedings, and the opportunity to be heard and participate in the class proceedings.") (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S.

North Carolina Objectors' claims are "uniquely" valuable as compared to the other class members' state law claims, we conclude their arguments merited more discussion than the Court gave them. *Cf. Community Bank I*, 418 F.3d at 309–10 (directing the Court to "pay particular attention to the prevalence of colorable TILA, HOEPA, *and other claims* that the individual class members may have which were not asserted by class counsel" (emphasis added)). We request that the Court on remand consider the North Carolina Objectors' arguments and determine whether the creation of a subclass is necessary to represent their interests adequately.

## B.     The Fairness of the Settlement

The Settling Parties argue that, "even if the [D]istrict [C]ourt's analysis about the viability of the posited TILA/HOEPA claims were flawed . . . , the Modified Settlement still should be approved, given that it fairly compensates Class members for those hypothetical claims." (Settling Parties' Br. at 161.) We disagree, as there is no "harmless error" doctrine that applies to cure a class representative's inadequacy in light of what may appear to be a "fair" settlement. As the Supreme Court has recognized,

> [w]here differences among members of a class are
> such that subclasses must be established, we

797, 811–12 (1985)).

89

know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.

*Amchem*, 521 U.S. at 627 (quoting *In re Joint E. and S. Dist. Asbestos Litig.*, 982 F.2d 721, 742–43 (2d Cir. 1992)). Indeed, "the determination whether 'proposed classes are sufficiently cohesive to warrant adjudication' must focus on 'questions that preexist any settlement.'" *Ortiz*, 527 U.S. at 858 (quoting *Amchem*, 521 U.S. at 622–23); *see also General Motors*, 55 F.3d at 795 ("[T]he inquiry into the settlement's fairness cannot conceptually replace the inquiry into the propriety of class certification."). Accordingly, because the settlement appears to lack "structural assurance of fair and adequate representation for the diverse groups and individuals affected," *Amchem*, 521 U.S. at 627, we again decline "to address definitively" the substantive

fairness of the settlement.[32] *Community Bank I*, 418 F.3d at 318.

However, nothing we have said should be interpreted as concluding that the total compensation provided in Modified Settlement could not be approved as fair, adequate, or reasonable. In particular, we are troubled by the Objectors' apparent belief that any settlement that does not fully account for (1) trebled damages under RESPA, and (2) the full measure of statutory (in addition to actual) damages under TILA and HOEPA, is hopelessly inadequate, unfair, and unreasonable.[33]

---

[32]Appeal No. 09-2001 was filed by the plaintiffs in *Drennan v. Community Bank of Northern Virginia*, a non-class action asserting claims for rescission against CBNV and RFC that was transferred to the District Court. These plaintiffs—John and Rowena Drennan, David and Diane Garner, and Shawn and Lorene Starkey—did not opt out of the Modified Settlement, but nonetheless argue that their rescission claims were not within the scope of the settlement's release. The District Court disagreed and granted defendants' motion to dismiss their claims. In light of our decision to vacate the Court's certification order and approval of the Modified Settlement, we do not address this argument.

[33] In its most extreme form, this position is exemplified by the briefs filed by counsel for the Objectors from Alabama and Georgia, attorney Franklin R. Nix. Mr. Nix—believing that "the state of the record is such that merely voiding the 'modified settlement' and returning the case to its status quo ante would

Contrary to the Objectors' contentions, we know of no authority that *requires* a district court to assess the fairness of a settlement in light of the potential for trebled damages. *Compare Suffolk Cty. v. Long Island Lighting*, 907 F.2d 1295, 1324 (2d Cir. 1990) ("[I]t is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure."), *with Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 964–65 (9th Cir. 2009) ("We have never precluded courts from comparing the settlement amount to both single and treble damages. By the same token, we do not require them to do so in all cases.").

In any event, the District Court—having determined that the TILA/HOEPA claims were not viable because they were time-barred—never addressed the fairness of the settlement in light of the potential statutory damages available under TILA and HOEPA, and we do not do so in the first instance. We point

---

saddle class members with only more of the 'law's delay'"—urges us not only to vacate the settlement, but to remand this case (to a different District Court Judge) with instructions to enter an order *granting summary judgment* "for all class members . . . as to liability and damages for violations of TILA, TILA rescission, HOEPA, and RESPA[.]" (Objectors' Br., No. 08-3790, at 1, 28.) We agree with the Settling Parties that Mr. Nix's request "is beyond unorthodox and has no support in the law, the rules of procedure, or the record." (Settling Parties' Br. at 50 n.6.) We therefore reject it.

92

out, however, that the Objectors' contentions that the statutory damages available in a TILA/HOEPA class action are "automatic," and that "there is no judicial discretion involved in the award to be made to the Class Members," are simply incorrect. (Objectors' Br., No. 08-3621, at 91.) The statute makes clear that, although there is no cap on claims for statutory damages in a class action asserting violations of the disclosure requirements for loans subject to HOEPA, *see supra* at 14 n.9, a district court nonetheless has discretion—after considering several specifically stated factors—in determining the amount of the award to the class. *See* 115 U.S.C. § 1640(a) ("In determining the amount of award in *any* class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional." (emphasis added)).

## C.     The Objectors' Renewed Motion to Intervene

In addition to their challenges to the District Court's class certification decision and approval of the Modified Settlement, the Objectors also contend that the Court abused its discretion when it denied as untimely their November 2007 motion to intervene. In light of our conclusion that the Court erred in evaluating the adequacy requirement, little turns on this question; on remand, the Court should revisit whether the named

93

plaintiffs and class counsel are adequate class representatives, and the Objectors may again seek to intervene in that context. In any event, we conclude that the Court did not abuse its discretion in denying the Objectors' renewed motion to intervene.

In *Community Bank I*, we stated that "[t]he time frame in which a class member may file a motion to intervene challenging the adequacy of class representation must be at least as long as the time in which s/he may opt-out of the class." 418 F.3d at 314. Moreover, a motion to intervene made within that time period is "presumptively timely." *Id*. The Objectors note that they filed their renewed motion to intervene in November 2007, before the opt-out period had ended. Accordingly, they contend that their renewed motion was timely.

However, we also stressed in *Community Bank I* that the "[t]imeliness of an intervention request 'is determined by the totality of the circumstances.'" *Id*. (quoting *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181 (3d Cir. 1994)). As noted, the Objectors withdrew their 2003 motion to intervene on remand, apparently believing that the MDL transfer of the *Hobson* action would permit them an opportunity, in effect, to depose existing class counsel and take over these consolidated class actions. The record reveals that this expectation was unfounded; the Court never told the Objectors it would permit them to file an amended consolidated complaint for all of the consolidated actions, and made clear during the November 2005

94

conference that it intended to address class certification and approval of the Modified Settlement in the consolidated *Kessler* action before dealing with any matters in the other transferred cases.

In any event, once the District Court determined (in October 2006) that the TILA/HOEPA claims were not viable, the Objectors were on notice that their interests would not be adequately pursued by the named plaintiffs and their counsel. The Objectors nonetheless waited almost a year before filing their renewed motion to intervene. *See* Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 4:36, at 769 (6th ed. 2010) ("This 'sit back and wait' approach [is impermissible] where the would-be intervenors should reasonably know that their interests will no longer be represented by the named plaintiff, as where the named plaintiffs' litigation decisions indicate that they have abandoned [certain] claims . . . ."). In these circumstances, we cannot say that the Court abused its discretion in denying as untimely the Objectors' renewed motion to intervene.

D.    The Objectors' Renewed Petition for Mandamus to Recuse the District Judge

Following oral argument in *Community Bank I*, the Objectors moved to reassign these actions to a different District Court Judge in the event we vacated the Court's certification and settlement approval decisions. They purported to move

95

under 28 U.S.C. § 2106, which authorizes federal appellate courts to

> affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, [or] remand the cause and direct the entry of such appropriate judgment, decree, or order, *or require such further proceedings to be had as may be just under the circumstances*.

*Id.* (emphasis added). We construed the Objectors' motion as a petition for mandamus, seeking an order from our Court directing the District Court Judge to recuse himself under 28 U.S.C. 455, which provides as follows:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) [The judge] shall also disqualify himself in the following circumstances:

>> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

96

*Id.*; *Community Bank I*, 418 F.3d at 319–20.  We denied the Objectors' petition for mandamus, noting that they had "ma[d]e no allegation that the District Court derived its alleged bias from an extrajudicial source," but instead relied solely on "rulings or statements made by the District Court during the course of the proceedings."  *Id.* at 320; *see also Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.").

Before oral argument in the current appeals, the Objectors again moved to reassign these actions to a different District Court Judge—"pursuant to [our Court's] supervisory powers and authority under 28 U.S.C. § 2106," Mot. at 1—in the event we again remand.  In support of their claims of bias, they rely on the following: (1) the District Court's *ex parte* conferences with the Settling Parties during the course of the proceedings before our decision in *Community Bank I*; (2) the erroneous legal conclusions in the Court's 2006 Memorandum, and its refusal to certify that Memorandum for an interlocutory appeal;[34] and (3) the Court's supposed failure to advance the

---

[34] We note that the District Court could not have certified its 2006 Memorandum for appellate review under 28 U.S.C. § 1292(b) or Federal Rule of Civil Procedure 54(b), as it was an interlocutory ruling on a question of law, not an order or a judgment.  *See Link v. Mercedes-Benz of N.A., Inc.*, 550 F.2d 860, 863 (3d Cir. 1977) (*en banc*) ("[O]ur jurisdiction extends only to orders of the district court."); *see also* Wright & Miller,

MDL proceeding (specifically, its failure to rule on motions in the *Hobson* action filed by counsel for the Objectors).

We again construe the Objectors' motion as a petition for mandamus. As is evident from the above, however, the Objectors once more rely on little more than the "rulings or statements made by the District Court during the course of the proceedings" in support of their renewed petition. *Community Bank I*, 418 F.3d at 320. The Objectors' other allegations of bias on the part of the District Court border on the frivolous,[35]

---

*Federal Practice and Procedure* § 3930 n.2 (district courts do not have the authority to certify "issues" to a court of appeals).

[35] Particularly baseless are the two new "extrajudicial sources" supposedly suggestive of bias that the Objectors identify: (1) that the District Court Judge was a speaker at Reed Smith LLP's "Diversity Retreat" in 2005 (Reed Smith represents RFC in this case); and (2) one of the Judge's former law clerks, now a United States Magistrate Judge, was a partner at Reed Smith for 13 years. Mot. at 28–29. Not only are these facts wholly inadequate to show objective bias, we note that the Objectors never raised these concerns with the District Judge. In that light, we believe Judge Ziegler aptly characterized (in his "advisory" ruling) the Objectors' attacks on the District Judge:

> We should note that, while criticism of a district court's unfavorable rulings and procedures are common and expected, Objectors' counsel has, in

98

and we are troubled by their accusations—which we see nothing in the record to support—that the District Court intentionally disregarded our mandate in *Community Bank I* in order to reach a pre-determined result. *E.g.*, Mot. at 14 (accusing the District Court Judge of "disregard[ing] this Court's mandate . . . in order to again reach the same result [he] intended all along—approval of the class action settlement"); *id.* at 16 (accusing the Judge of being "intellectually dishonest and duplicitous"); *see also* Objectors' Br., No. 08-3790, at 2 (requesting that our Court remand this case "to a different district court unburdened by hidden agendas"). Accordingly, and notwithstanding our conclusion that the District Court erred in re-certifying the class, we deny the Objectors' petition for mandamus.[36]

_____

our view, exceeded the bounds of professional conduct by making unwarranted, unnecessary and, quite frankly, silly attacks on the district court in its legal brief. . . . These attacks serve only to reduce the civility and decorum of the proceedings[.]

[36] In this context, we believe it appropriate to re-state our closing admonition from *Community Bank I*:

We note as well that the District Court was besieged by opposing groups of lawyers who flooded it with numerous motions, arguments, and counter-arguments, which undoubtedly made it

99

## IV.    Conclusion

In summary, we conclude the District Court applied an incorrect legal standard, and thus abused its discretion, in determining that the named plaintiffs and class counsel are adequate representatives for the class. In addressing the adequacy requirements on remand, the Court should in particular consider, consistent with the standards we have discussed, (1) whether a subclass of class members with timely RESPA and/or TILA/HOEPA claims should be created; and (2) whether class counsel are adequate representatives for the class, and/or any subclasses that may be created, in light of counsel's justifications given for their decision not to bring TILA/HOEPA claims on behalf of the class.

---

> difficult for the Court to engage in the reflection needed to exercise its fiduciary duty to assure that the settlement process was procedurally fair. . . . We believe it is the responsibility of counsel, consistent with their obligations to their clients, to assist the district courts in their difficult tasks of managing often unwield[y] class actions by eliminating unnecessary motions, exercising restraint in filing objections, and treating opposing counsel with the civility that should characterize attorney relations.

418 F.3d at 320 n.37.